**UNITED STATES of America, Appellee,**

v.

**Michael COIRO, Defendant–Appellant.**

**No. 1601, Docket 90–1192.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1990.

Decided Jan. 3, 1991.

Gerald L. Shargel (Alan S. Futerfas, New York City, of counsel), for defendant-appellant.

John Gleeson, Asst. U.S. Atty, Brooklyn, N.Y. (Andrew Maloney, U.S. Atty. E.D. N.Y., David C. James, Asst. U.S. Atty., of counsel), for appellee.

Before WINTER, MAHONEY and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Following a jury trial before then-District Judge Joseph M. McLaughlin in the Eastern District of New York, appellant Michael Coiro, an attorney and the sole defendant at trial, was convicted of conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); conspiring to obstruct justice and to obstruct a criminal investigation, in violation of 18 U.S.C. § 371; two counts of obstructing a criminal investigation, in violation of 18 U.S.C. § 1510(a); and two counts of obstructing a grand jury investigation, in violation of 18 U.S.C. § 1503. Coiro was sentenced to a 15–year term of imprisonment and a $25,000 fine on the RICO count, and to concurrent terms of five years on each of the remaining counts.

On appeal, Coiro contends that his obstruction convictions under 18 U.S.C. § 1510(a) should be reversed because his conduct was not cognizable under that statute, and that one of those counts should be vacated as multiplicitous. Coiro also argues that the district court erred in admitting evidence of the drug-trafficking arrest of two members of the Ruggiero organization, and of Coiro's bribing an employee of the Nassau County District Attorney's office. He further alleges that one of the counts of obstructing a grand jury investigation was not supported by sufficient evidence. Coiro also challenges the constitutionality of the RICO pattern requirement, 18 U.S.C. § 1962(c), and claims that the government failed to establish such a pattern of racketeering activity in this case.

## BACKGROUND

Coiro was a criminal defense attorney whose clients included Angelo Ruggiero, Gene Gotti and John Carneglia, partners in a large narcotics enterprise. Coiro was indicted in 1983, along with these three and others, as a result of FBI and grand jury investigations begun in late 1981 into the Ruggiero enterprise.

The evidence at Coiro's trial, based in part on conversations recorded by the FBI with electronic surveillance, revealed Coiro's involvement in the narcotics organization at least as early as February, 1982. Coiro, who had last represented a member of the enterprise in 1975, now helped them by bribing and facilitating the bribing of law enforcement and other officials to obtain confidential information, by assisting the concealment and laundering of narcotics proceeds, and by otherwise using his position as an attorney to assist other members of the enterprise in avoiding criminal prosecution.

In particular, Coiro assisted the enterprise after the death of one of its members, Salvatore Ruggiero, Angelo Ruggiero's brother. Since 1975, Salvatore, although a fugitive facing narcotics and tax evasion charges, continued to engage in drug trafficking. After he died in a crash on May 6, 1982, the FBI and the grand jury began to inquire into his previous activities, into possible harboring by others, and into the location of assets he had amassed from the narcotics business. During this period, Coiro helped to create false stories to be fed to the authorities, conceal evidence, and influence the testimony of prospective witnesses, in order to obstruct the pending law enforcement and grand jury investigations. The nature of Coiro's commitment to the enterprise can be inferred from a conversation intercepted on May 12, 1982:

GOTTI: You're not our lawyer, you're one of us as far as we're concerned.

COIRO: I know it, Genie, and I feel that way. That's a honor.

## The RICO Charge

The RICO charge was based on Coiro's knowing participation in Angelo Ruggiero's narcotics organization and his furtherance of its illegal purposes through bribery and money laundering.

On May 21, 1982, Coiro, Ruggiero and Gotti were recorded discussing whether they should pay additional money to an official in the Nassau County District Attorney's office for further information regarding that office's investigations. The official had previously been paid to provide a confidential list of organized crime figures residing in Nassau and Suffolk counties. Coiro brought that list to the meeting and the three men quoted from it during the conversation. Ruggiero told Gotti:

> Soon as he hears anything, he'll be in touch with us immediately. The guy's looking for a nickel, he will continue looking, anything at all. And, I gave 'em a dime already.

Coiro, supporting the additional bribe, observed that "[f]orewarned is forearmed." Gotti agreed, noting that the source was "close to Dillon," the Nassau County District Attorney. After deciding that the extra bribe was worth it "[j]ust to get the hook in there," Gotti emphasized that Coiro was the one dealing with this source: "Mike, all we're dealing with is you, and you deal with the guy."

Coiro had additional corrupt sources in Brooklyn and Queens. On May 12 and May 21, the government intercepted conversations in which Gotti and Coiro discussed a source Coiro had in the Eastern District. On May 13, in a conversation intercepted by the government, Coiro spoke to Ruggiero about his source in Queens, who apparently was aware of sealed materials.

Further, Coiro was involved in the organization's hiring of an individual, named Jack Conroy, to detect electronic surveillance and bribe telephone company employees for information on wiretaps. In an April 25, 1982 conversation, Ruggiero apprised Carneglia of Conroy's source in the telephone company, whereupon Carneglia observed that "This guy'll become a hook." In response to Carneglia's inquiry as to Conroy's trustworthiness, Ruggiero said, "I asked Mike Coiro today. He said, listen, John McNally recommended him. Go to sleep with him." On May 8, Coiro, Ruggiero and Gotti talked about wiretaps Conroy had identified. When Gotti asked, "[c]ould we put stock into this guy," Coiro responded, "Yeah, yeah, put stock in him. The guy, guy worked for ... years in the P.D." Later, Ruggiero noted that he had recently paid Conroy in Coiro's presence, which Coiro acknowledged.

Coiro also assisted the Ruggiero organization by helping to conceal the proceeds of narcotics trafficking. The May 12 conversation among Coiro, Ruggiero and Gotti is instructive:

> RUGGIERO: Ah, let me ask you something Mike.... If I get some money.... Will you hold it?
>
> COIRO: Yeah.
>
> RUGGIERO: I'm not talking about large, large.
>
> GOTTI: Before you hold anything, Mike. I got to ask you one more thing. Are you holding anybody else's ...?
>
> COIRO: No, that's all straightened out.
>
> GOTTI: [A]nd nobody's to know, but us.

On May 21, Ruggiero and Coiro again discussed the laundering of narcotics proceeds. Ruggiero told Coiro: "[M]y problem is getting this money to Raymond [Kobus]," a young attorney working for Coiro, and said he wanted to "give him [Kobus] a [percentage] point on the money" for "cash[ing]" the bills, i.e., changing small bills into large ones. Coiro objected to paying Kobus too much: "I wanted him to know there are certain things in this life that he's gotta do, and he's just gotta do it and he don't say a word." Coiro stated that he had already told Kobus that "if they're making money you could rest assured of one thing, you're gonna make money." On Coiro's instructions, Kobus later went to Ruggiero's house to pick up the money.

*The Obstruction Charges*

The various obstruction of justice charges on which Coiro was convicted and which he challenges here were based on his conduct in the aftermath of Salvatore Ruggiero's death. The two counts of obstructing a criminal investigation were based upon the fabricated story meant for the FBI that Coiro helped create. Coiro was convicted on two counts of endeavoring to obstruct the grand jury investigating the harboring of Salvatore Ruggiero. Those charges stemmed from Coiro's counseling others to conceal and destroy evidence, to liquidate property derived from Salvatore's fugitive drug trafficking, counseling others to influence the testimony of prospective witnesses, helping to launder Angelo Ruggiero's narcotics proceeds, counseling Angelo Ruggiero to testify falsely, and finally, offering himself to testify falsely.

The specific events leading to Coiro's obstructive conduct began on May 6, 1982, when the Federal Aviation Administration notified Alfred Dellentash of the crash of the private jet carrying Salvatore Ruggiero. Dellentash was a drug smuggling partner of Salvatore and co-owner of the jet. Dellentash and Wayne Debany, another former drug smuggling associate, drove to Salvatore's house in New Jersey, meeting Carneglia, Angelo Ruggiero, and Gene Gotti, whom they notified of Salvatore's death.

Angelo Ruggiero, who supposedly had no contact with his brother, had actually been in continuous contact with his brother for the previous several years. Ruggiero was concerned about possible exposure to harboring charges as well as locating and acquiring his brother's accumulated narcotics assets. He directed the removal of any evidence from his brother's house that might link him to Salvatore.

Also concerned that the FBI would contact Debany and Dellentash to inquire as to how Ruggiero knew that his brother died, Ruggiero summoned the two to his home on the next day. When they arrived, Ruggiero, Carneglia, Gotti and Coiro were already present. The group discussed how to explain Ruggiero's knowledge of Salvatore's death since he was supposedly unaware of Salvatore's whereabouts. Coiro rejected stories he did not think would be effective, and finally approved the false story that would be given to the FBI. The investigators would be told that, upon learning from the FAA of Salvatore Ruggiero's death, Debany and Dellentash went to his home, whereupon they discovered an envelope marked "In case of emergency" containing the address and phone number of his parents. They would next say that Debany then went to the parents' house and told them of their son's death, whereupon Angelo was informed. The day after this story was concocted, Dellentash told it in part to an FBI agent who was investigating the possible harboring of Salvatore and events in the wake of his death.

On May 8, 1982, when Angelo Ruggiero discussed selling his brother's house in Florida at a discount, Coiro agreed, stating, "Salvage what ya can." On May 16, when Coiro and Ruggiero sorted through the papers taken from Salvatore's home, including bills, checks, bank records and a phone book—all pertinent to a harboring investigation—Coiro advised Ruggiero to "get rid of all this." Subsequently, on May 21, Ruggiero told Coiro that his brother had $192,000 worth of stock that Ruggiero intended to liquidate right away. Coiro agreed, adding, "[D)on't even waste any time."

After the agents interviewed Estelle Mitchell, Salvatore's sister-in-law, and threatened a grand jury subpoena, Ruggiero and Coiro met her and her mother, Dorothy Rubin, on May 17 to express concern over the pending investigation. However, Ruggiero and Coiro later concluded that Rubin and Mitchell might not cooperate with their efforts to deceive the authorities. Coiro noted: "They're going to the weakest link in the chain. ... you're not dealing with people like us." On May 22, after Mitchell had been subpoenaed, Coiro and Ruggiero discussed ways to influence her and Rubin to testify falsely. When Ruggiero asked Coiro to try to find somebody to speak to their lawyer, Coiro replied, "I already did," and stated that he was trying to find "somebody who knows him." La-

ter, after discussing having Willie DiSapio, Rubin's ex-husband, attempt to influence Mitchell and Rubin, Coiro stated, "Well, that's what I figured that will be the only guy that, that might be able to get to them."

On May 21, Coiro also helped prepare Ruggiero himself to testify falsely before the grand jury so as to limit Ruggiero's exposure to a harboring charge. Coiro instructed him to remember that, "We've had negotiations going to bring your brother back. He always contacted us." Ruggiero noted, however, that this story ran afoul of the fact that there was a wiretap on his phone that would reveal that Salvatore had never called his home. Coiro then suggested the story that Salvatore always called Rubin and told her to contact Angelo. When Ruggiero rejected that story, Coiro volunteered himself as the fictitious link.

### DISCUSSION

I. Challenges to Obstruction of Criminal Investigation Counts

 Coiro asserts that the two obstruction of investigation counts, based on his participation in the concocting of the false story for Debany (Count Seven) and Dellentash (Count Eight) to tell the investigators, fail to charge cognizable offenses under 18 U.S.C. § 1510(a) and are multiplicitous, since they charge the same conduct. The government argues that such challenges "to a potential defect in the indictment" should have been made before trial and that, since they were not, Coiro has waived his claim. Fed.R.Crim.P. 12(b)(2); 12(f). But neither the nature of Coiro's conduct nor the fact that Counts Seven and Eight charge the same conduct was evident from the face of the indictment. This could only be known upon the receipt of evidence that Coiro on a single occasion on May 7, 1982 reviewed false stories to be given to the investigators with Ruggiero, Carneglia, Gotti, Debany, and Dellentash, until Coiro approved the one that would be used. Further, we find that the two issues, which go to whether the conduct proved is

punishable under the statute charged, are cognizable on appeal under the plain error doctrine, even though Coiro failed to raise them post-trial. *See United States v. DiGeronimo*, 598 F.2d 746, 752 (2d Cir.), *cert. denied*, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979).

 Coiro first argues that the two investigation obstruction counts, based on his participation in the concocting of the false story for Dellentash and Debany to tell the investigators, fail to charge cognizable offenses under 18 U.S.C. § 1510(a).

When the relevant conduct occurred, 18 U.S.C. § 1510(a), in pertinent part, punished:

> Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator....

*See* Pub.L. 90–123, § 1(a), Nov. 3, 1967, 81 Stat. 362.[1]

Coiro argues that § 1510(a) does not apply where the person who endeavors to obstruct the communication of information does so through an accomplice who agrees to lie to the investigator. He is incorrect. Section 1510 is violated "whenever an individual induces or attempts to induce another person to make a material misrepresentation to a criminal investigator." *United States v. St. Clair*, 552 F.2d 57, 58 (2d Cir.) (per curiam), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977). *See also United States v. Daly*, 842 F.2d 1380, 1392 (2d Cir.), *cert. denied sub nom., Giardina v. United States*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *United States v. Fitterer*, 710 F.2d 1328, 1330–31 (8th Cir.), *cert. denied*, 464 U.S. 852, 104 S.Ct. 165, 78 L.Ed.2d 150 (1983).

Coiro's argument is supported by the Fifth Circuit's holding in *United States v. Cameron*, 460 F.2d 1394, 1400–02 (5th Cir. 1972). But we have already rejected in *St. Clair* the reading of the legislative history

---

1. Pub.L. 97–291, § 4(e), Oct. 12, 1982, 96 Stat. 1253, amended this section in part by striking out ", misrepresentation, intimidation, or force or threats thereof" after "bribery".

followed in *Cameron* and, at least to the extent that *Cameron* purports to require that the misrepresentations be made to the one who communicates with the investigator, instead of solely to the investigator, we decline to follow it. *See United States v. Fitterer.* Thus, it was not error to charge Coiro with a violation of § 1510(a) based on his conduct on May 7, 1982.

Coiro also attacks the two § 1510 counts, Seven and Eight, because they derive from a single meeting where the story was constructed and transmitted simultaneously to Debany and Dellentash. He argues that the two counts charge the same conduct and are therefore multiplicitous, so that one of them must be vacated. The government admits that the interfering with Debany and Dellentash occurred in a single incident, but responds that "it seems likely that Congress intended to make the tampering of each witness a separate offense."

■ The relevant inquiry in determining the unit of prosecution under a criminal statute is what Congress intended. "When Congress has the will [to define a particular offense] it has no difficulty in expressing it...." *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955). In conducting the inquiry, we are informed by the rule of lenity, which dictates that in cases of ambiguity or doubt as to Congressional intent, only one offense may be charged. *See Bell,* 349 U.S. at 83, 75 S.Ct. at 622; *United States v. Johnpoll,* 739 F.2d 702, 715 (2d Cir.1984), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984), *reh'g denied,* 469 U.S. 1197, 105 S.Ct. 982, 83 L.Ed.2d 983 (1985); *United States v. Pelusio,* 725 F.2d 161, 169 (2d Cir.1983); *see also United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (rule supports two policies: (1) giving of fair warning to the world at large, and (2) leaving the definition of crimes within the province of the legislature, rather than the judiciary).

■ Here, neither the language of the statute nor the legislative history yields a clear answer as to what Congress intended as the unit of prosecution under § 1510. Section 1510 does refer to the individuals whose communication is obstructed. The statute prohibits interference with communication "by any person" to a criminal investigator. The government argues this language must be read as an indication that Congress meant to make each individual interfered with the subject of a separate count under the statute. Obstructing both Debany and Dellentash from communicating information to the criminal investigator would thus constitute two § 1510 violations, although Coiro accomplished this in a single endeavor.

We disagree with the government's reading of the statute. The modification of "person" by the word "any" makes that phrase ambiguous. In cases in this and other circuits, the word "any" has "typically been found ambiguous in connection with the allowable unit of prosecution," for it contemplates the plural, rather than specifying the singular. *United States v. Kinsley,* 518 F.2d 665, 668 (8th Cir.1975) (possession of "any firearm" under 18 U.S.C. § 1202(a) ambiguous on whether unit of prosecution is single firearm); *see Bell v. United States, supra* (knowing transport of "any woman or girl" ambiguous as to whether unit of prosecution is single female); *United States v. Rivera Ramos,* 856 F.2d 420, 422 (1st Cir.1988), *cert. denied,* — U.S. —, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989) (finding unit of prosecution in 18 U.S.C. § 111, which proscribes assault of "any [federal officer]" to be number of acts, rather than number of officers); *United States v. Pelusio,* 725 F.2d at 168 (statutory proscription of receipt of "any firearm or ammunition" by felon found ambiguous); *cf. Sanders v. United States,* 441 F.2d 412, 414 (10th Cir.), *cert. denied,* 404 U.S. 846, 92 S.Ct. 147, 30 L.Ed.2d 82 (1971) (under 26 U.S.C. § 5861, which proscribes possession of "*a* [unregistered] firearm," unit of prosecution is each firearm).

Further, § 1510 speaks in terms of the act of obstructing, as well as the number of potential sources of information. Its language proscribes an "endeavor" to obstruct the communication of information. Under this reading, the single incident in

which Coiro spoke to both Debany and Dellentash would be but a single statutory violation.

The legislative history does not clarify the ambiguity in the statutory language. The government quotes the House Report accompanying the bill, *see* H.R.Rep. No. 658, 90th Cong., 1st Sess. 1, *reprinted in* 1967 U.S.Code Cong. & Admin. News 1760, 1761, for the proposition that the unit of prosecution is the number of individuals tampered with. The Report states, "It is our intention that the [statute cover the] actual procurement by a party *of another party's* misrepresentation...." (emphasis added), but the thrust of the sentence is to avoid a construction that would confine the misrepresentation to the person obstructing, and not to define the unit of prosecution. *See United States v. St. Clair, supra.* Elsewhere in the House Report, an analysis of the bill is offered which emphasizes the *conduct* of the individual, e.g., obstructing the communication of information to an investigator, rather than the number of sources of information tampered with.

> [The proposed legislation] would prohibit willful attempts, by means of bribery, misrepresentation, intimidation ... to obstruct, delay, or prevent the communication to a Federal criminal investigator of information relating to a violation of a Federal criminal law. The subsection would also prohibit injuring any person ... on account of his communicating such information.

1967 U.S.Code Cong. & Admin. News at 1763 (emphasis added). The Senate Report accompanying the bill contains the identical language. *See* S.Rep. No. 307, 90th Cong., 1st Sess. at 2.

We find that Congress has not explicitly defined the unit of prosecution under § 1510, either in the statute itself or in the legislative history accompanying the statute. Accordingly, the rule of lenity is applicable, and one of the two counts charging the § 1510 violation as to Debany and Dellentash must be vacated. This is true, even though Coiro's sentences on the two counts were concurrent. A defendant suffers consequences of conviction apart than the sentence actually served. Such collateral consequences may include enhanced penalties under a recidivist statute, the future use of the conviction for impeachment of credibility, and the social stigma resulting from conviction. The second conviction is unauthorized punishment for the same offense, and must be vacated. *Ball v. United States,* 470 U.S. 856, 865, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985). Following *Ball,* we remand the two convictions to the district court for obstruction of a criminal investigation "with instructions to have the District Court exercise its discretion to vacate one of the[m]." 470 U.S. at 865, 105 S.Ct. at 1673. *See also United States v. Reed,* 639 F.2d 896, 904 n. 6 (2d Cir.1981).

## II. Coiro's Other Claims

Coiro asserts that the district court erroneously admitted evidence regarding the drug-trafficking arrest of Salvatore Greco and William Cestaro, two members of the Ruggiero organization, because its prejudicial effect outweighed the probative value of the evidence. Fed.R.Evid. 403. The two men were arrested after they met and exchanged packages, four pounds of heroin from Greco to Cestaro and two carry bags containing $150,000 from Cestaro to Greco. The government's evidence included the heroin and pictures of the carry bags and the money.

A determination that evidence is admissible after Rule 403 weighing may not be set aside unless there is a showing that the court abused its discretion, or acted arbitrarily or irrationally. *United States v. DiTommasso,* 817 F.2d 201, 217 (2d Cir. 1987); *United States v. Robinson,* 560 F.2d 507, 514 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

The evidence of Cestaro and Greco's arrest was relevant to show the existence of the narcotics enterprise charged in the indictment. The RICO count charged Coiro with being a member of a drug-trafficking enterprise, and with holding and helping launder the proceeds of that business. Moreover, the evidence regarding the ar-

rests is admissible under Rule 404 " 'to inform the jury of the background of the conspiracy charged,' " and " 'to complete the story of the crimes charged.' " *United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990) (quoting *United States v. Brennan,* 798 F.2d 581, 589 (2d Cir.1986); *United States v. Harris,* 733 F.2d 994, 1006 (2d Cir.1984). The evidence regarding the arrest of Cestaro and Greco, which was presented in a summary fashion, did not unfairly prejudice Coiro so as to warrant exclusion under Rule 403, regardless of his belated offer to stipulate to the arrests.

■ Coiro also objects to the government's introduction of evidence regarding his bribery of the employee in the Nassau County District Attorney's office. He claims that the indictment, which did not specifically mention the bribe, did not give notice of this charge, and that the evidence is inadmissible under Rule 404 because it is proof of an "uncharged crime." He further alleges that the evidence should have been excluded under Rule 403 because any probative value was outweighed by its prejudicial effect. These claims are without merit.

In 1984, Coiro received notice of the bribery as part of the RICO count when he obtained from the government a copy of the tape-recorded conversation of May 21, 1982 among Coiro, Ruggiero and Gotti discussing it. Later, in response to Coiro's motion to suppress that tape on attorney-client privilege grounds, the government expressly identified the conversation as an example of Coiro's role in the enterprise.

The evidence of the Nassau County bribery was clearly relevant to the crimes charged as "conduct designed to prevent Government detection of the illegal activities of the members of the enterprise," as alleged in the RICO count. Since the evidence was directly probative of a central allegation in the indictment, the fact that it may also have been probative of a separate uncharged crime is irrelevant. Finally, it was not unduly prejudicial under Rule 403.

■ Coiro next asserts that there was insufficient evidence to support the money laundering allegation against Coiro in the RICO count. This claim borders on the frivolous. A defendant challenging the legal sufficiency of trial evidence bears a "heavy burden." *United States v. Roman,* 870 F.2d 65, 71 (2d Cir), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989); *United States v. Gaviria,* 805 F.2d 1108, 1116 (2d Cir.1986), *cert. denied,* 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987). Viewing the evidence in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, *reh'g denied,* 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222 (1942), and drawing all reasonable inferences in favor of the jury's verdict, *see, e.g., United States v. Khan,* 787 F.2d 28, 33–34 (2d Cir.1986), we easily conclude that the jury could rationally have found beyond a reasonable doubt that Coiro knowingly helped conceal and launder drug proceeds. *See United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The evidence on this score, including Coiro's conversations with Ruggiero and Gotti concerning his and Kobus's holding and laundering of money, was more than ample. Coiro's claim that he did not know that the money represented proceeds of narcotics trafficking, based in part on a statement by Ruggiero made in Coiro's presence denying he was involved in selling drugs, is simply unavailing in the face of evidence from which the jury could infer that Coiro was fully aware of the nature of the enterprise in which he was a participant.

■ Finally, Coiro attacks the RICO pattern requirement, 18 U.S.C. §§ 1962(c) and 1961(5), arguing first that it is unconstitutionally vague because courts have had difficulty defining a "pattern of racketeering activity," and also that, apart from its constitutionality, his conduct in this case did not establish such a pattern. Currently, demonstrating a RICO pattern requires proof of multiple racketeering predicates— which can be part of a single "scheme"— that are related and that amount to, or threaten the likelihood of, continued criminal activity. *H.J. Inc. v. Northwestern*

*Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2898–2902, 106 L.Ed.2d 195 (1989). *See also United States v. Indelicato,* 865 F.2d 1370, 1381–84 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). We have previously found that RICO was not unconstitutionally vague in a variety of applications, *see United States v. Ruggiero,* 726 F.2d 913, 923 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); *United States v. Huber,* 603 F.2d 387, 393 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Parness,* 503 F.2d 430, 440–42 (2d Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), and we so find here, notwithstanding comments in the concurring opinion in *H.J. Inc.* · *See* 109 S.Ct. at 2909 (Scalia, J., concurring).

■■■■■ In the absence of first amendment considerations, vagueness challenges must be considered in light of the facts of the particular case. *See New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982); *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975). As RICO was plainly intended to encompass the illegal activities of organized crime, *see H.J. Inc.,* 109 S.Ct. at 2903–04; *Ruggiero,* 726 F.2d at 923, we are confident that the statute provided Coiro with fair notice that his contemplated conduct—bribery and money laundering on behalf of the Ruggiero narcotics enterprise—fell within RICO's strictures, and thus the statute is not unconstitutionally vague as applied to him. *Accord United States v. Pungitore,* 910 F.2d 1084, 1102–05 (3d Cir.1990) (rejecting vagueness challenge to RICO, noting that potential due process problems cited by Justice Scalia are not present in organized crime cases); *United States v. Angiulo,* 897 F.2d 1169, 1178–80 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990) (same). The present indictment is not invalid simply because other marginal cases, real or imagined, criminal or civil, might involve facts that create undue uncertainty as to the application of RICO's pattern requirement to a defendant's activities. *See Ruggiero,* 726 F.2d at 923; *Pun-*

*gitore,* 910 F.2d at 1104; *Angiulo,* 897 F.2d at 1179.

■■■■ Finally, under *H.J. Inc.* and *Indelicato,* the trial evidence of Coiro's numerous activities involving bribery and money laundering on behalf of organized crime was more than ample to establish a RICO pattern, including the requisite relatedness and continuity. As the jury was charged, a threat of continuity may be established if the "predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit," or "where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J. Inc.,* 109 S.Ct. at 2902; *see also Indelicato,* 865 F.2d at 1383–84 ("[w]here the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity").

Coiro's assertion to the contrary notwithstanding, the predicate acts with which Coiro was charged did not derive solely from the period immediately following Salvatore Ruggiero's death. The jury was entitled to infer from the evidence that the Ruggiero organization was a long-term criminal enterprise engaged in narcotics trafficking both before and after Salvatore's death; that Coiro was an active participant from at least as early as February, 1982; and that the instances of Coiro's bribery and money laundering were calculated, connected activities in furtherance of the enterprise, were ongoing prior to Salvatore's death, and continued and threatened to continue after his death. In short, the evidence established that Coiro had become a full-fledged member of the enterprise, and that his activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention.

## CONCLUSION

We have examined Coiro's remaining arguments and find them to be without merit.

The convictions are affirmed with the exception of Counts Seven and Eight. As to those, the case is remanded to the district court with instructions to dismiss either Count Seven or Eight. While normally such instructions would include instructions to resentence on the remaining counts, we decline to do so here since the prison sentences on Counts Seven and Eight are concurrent and no fine was imposed on either count.

Judgment affirmed in part; remanded in part with instructions to vacate.