## UNITED STATES of America

### v.

### Harvey B. BAUM and Guillermo Vasquez a/k/a "William," Defendants.

### No. 98 Cr. 841(DC).

United States District Court, S.D. New York.

Jan. 11, 1999.

---

Mary Jo White, United States Attorney for the Southern District of New York by Tai H. Park, Andrea Labov, Assistant United States Attorneys, New York City, for U.S.

Joseph A. Bondy, New York City, for Harvey B. Baum.

*OPINION*

CHIN, District Judge.

In this case, defendant Harvey B. Baum, a criminal defense attorney, is charged with conspiracy, obstruction of justice, false statements, and perjury. The government contends that Baum and his investigator, defendant Guillermo Vasquez, attempted to deceive the government into filing a Rule 35 motion on behalf of an individual who had been sentenced to 20 years imprisonment for narcotics trafficking and murder. Such a motion would have permitted the sentencing judge to reduce the individual's sentence. The government contends that Baum and Vasquez believed that if their scheme succeeded, a convicted drug dealer and murderer would have had his sentence reduced under false pretenses and they would have received as much as $1 million in drug proceeds.

Baum moves to dismiss Count Two of the indictment, which charges obstruction of justice in violation of 18 U.S.C. § 1503, on the ground that the statute does not apply to the alleged conduct. In particular, Baum argues that there could have been no obstruction of justice because there was no "pending proceeding" at time of the alleged conduct that could have been obstructed within the meaning of the statute. In essence, Baum argues that the obstruction of justice statute does not reach the efforts of an attorney to deceive the government into filing—and the court into granting—a post-judgment Rule 35 motion for the reduction of sentence.

Baum's arguments are rejected. The language of § 1503, its purpose, the case law, and policy considerations all firmly point to the conclusion that an attorney who engages in a scheme to manipulate the government into filing a Rule 35 post-judgment motion for the reduction of sentence obstructs justice within the meaning of the statute. As a criminal defense attorney, Baum surely understood that his actions, if successful, would improperly influence the government and the court. He surely also understood the threat that corrupt attorneys pose to our adversarial system of justice. If the government's allegations are true, then Baum must be held

accountable. Accordingly, the motion to dismiss Count Two is denied.

## STATEMENT OF THE CASE

### A. The Facts [1]

In June 1991, an individual referred to in the indictment as the "Cooperating Witness" (the "CW") was arrested and charged with narcotics trafficking and murder in aid of racketeering. He pled guilty in the Southern District of New York and began cooperating with the government. On September 24, 1997, he was sentenced to twenty years imprisonment.[2]

Just a few weeks later, Baum and Vasquez purportedly devised a scheme to help the CW obtain a reduced sentence. Baum and Vasquez agreed that, in return for payment by the CW of as much as $1 million, Baum would induce the U.S. Attorney's Office for the Southern District of New York to file a Rule 35 motion on behalf of the CW.[3] The CW, however, contacted the government and disclosed defendants' plan. Under the government's direction, the CW thereafter began pretending to participate with defendants in their scheme.

Defendants' plan was as follows: Baum had previously represented Juan Rendon, who, after serving a seven-month sentence for making false statements, had returned to his native Colombia. There, he had become acquainted with an individual known as "Maya," who was suspected of being a drug trafficking kingpin and who was then being investigated by the New York Drug Enforcement Task Force. Baum and Vasquez agreed that Vasquez would contact Rendon in Colombia to persuade Rendon to lure Maya back into the United States, where he could then be arrested and prosecuted. They also agreed that Baum would negotiate

with the government to credit the CW with Maya's capture, that is, Baum would attempt to persuade the government to give credit for Rendon's efforts to the CW, on whose behalf the government would then file a Rule 35 motion. The plan would include transferring the Wisconsin case to the Southern District of New York, where the two cases would be consolidated.

One impediment to defendants' plan was the government's policy with respect to "third-party cooperation agreements." In the Southern District of New York, the government's practice is that it will not agree to credit a defendant with a third party's cooperation unless: (1) the third party is a close relative or a friend of the defendant who is not providing the cooperation for money, and (2) the defendant has some personal knowledge of the investigated conduct so that he or she can personally assist in the investigation.

Here, defendants' plan ran afoul of the government's policy in at least two respects. First, although Rendon had met the CW briefly in prison, they were not related and were not friends. Second, Rendon would have been willing to become involved only in return for money.

To overcome these hurdles, defendants agreed that Baum would act as the CW's attorney and that defendants and the CW would seek to induce the government to consent to a third-party cooperation agreement, whereby the CW would be credited with Rendon's efforts. They agreed to falsely represent certain facts to the government, including that: the CW and Rendon were friends; the CW had protected Rendon from other inmates, who were members of the Latin Kings, when they were in prison together; Rendon was agreeing to help the

1. The factual allegations of the indictment are assumed to be true for purposes of this motion. Baum, of course, has pled not guilty and therefore he has denied the allegations of the indictment.

2. The CW had also received a concurrent sentence of 34 years imprisonment for a narcotics conviction in the Eastern District of Wisconsin.

3. Rule 35(b) of the Federal Rules of Criminal Procedure provides that "[t]he court, on motion

of the Government made within one year after the imposition of the sentence, may reduce a sentence to reflect a defendant's subsequent, substantial assistance in the investigation or prosecution of another person ...." Once the government files a Rule 35 motion on behalf of a defendant who has been sentenced, the sentencing court may review the sentence and reduce it to any extent the court in its discretion determines is appropriate.

government capture Maya not for money but to assist his friend, the CW; Baum was personally interested in working for the CW because his wife's family knew the CW's family; Baum and Vasquez would be paid a total of $100,000 for legal fees and expenses; and the $100,000 would come from legitimate sources (the CW's grandfather) rather than from the proceeds of the CW's narcotics trafficking.

In fact, the CW and Rendon were not friends; the CW had never protected Rendon from other inmates while they were in prison; defendants planned to pay Rendon for his assistance; there was only a tenuous connection between Baum's wife's family and the CW's family; defendants expected the CW to pay them not $100,000 but as much as $1 million; and defendants knew that the money was coming not from the CW's grandfather, but from the proceeds of drug trafficking.

Baum and Vasquez met with the CW at the Otisville prison on May 1, 1998 to come up with a story and to rehearse the lines they would use when they met with the prosecutor. Unbeknownst to Baum and Vasquez, the meeting was tape recorded by the government. The government's draft transcript of the meeting shows Baum, Vasquez, and the CW concocting their story:

> [THE CW]: Okay, so we're there. So this is what's important. [Rendon] ah, we establish here first. Okay? That uh, what did we talk, we talked ah, he was in here, in jail with me. He introduced me to you.
>
> BAUM: You've spoken, you've spoken to him since then.
>
> [THE CW]: I spoke[ ] to him since then. Well, I have now—. It's on my phone.
>
> BAUM: He's helped, he's helping to help you out. You helped him out with the Latin Kings.
>
> [THE CW]: I helped him out with the Latin King. Okay, now let me ask you this. I, I been over in my head a million times. There's no way they can come and verify

that. Look at this incident here. They can't...

(5/1/98 Draft Tr. at 10–11).

Baum met with the prosecutor on May 9, 1997. He attempted to persuade the prosecutor to agree to a third-party cooperation arrangement by making false representations. Unbeknownst to Baum, the government tape recorded the conversation. The government's draft transcripts show that Baum represented to the prosecutor as follows:

> According to [the CW], and [Rendon] verified this, I guess he kind of protected him, [Rendon]. [Rendon]'s a little guy and there was a lot of problems they were having which I think you may be aware of, the Latin Kings are up at Otisville.
>
> . . . .
>
> So when [Rendon] left he said, look if I could ever be of any help to you.
>
> . . . .
>
> [Rendon's] doing it not for anything other than return of a favor to [the CW].

(5/8/98 Draft Tr. at 2, 4). The prosecutor asked: "It's not being, it's not for money[?]" Baum responded: "No." (*Id.* at 9).

In fact, according to the government, the CW did not provide Rendon with protection at Otisville, from the Latin Kings or anyone else; Rendon was not becoming involved to return a favor to the CW; and Rendon was indeed to be paid money.

Baum met with the CW again on May 14, 1998. They had agreed that the government would be told that Baum was to receive $100,000 for fees and expenses,[4] and they discussed what Baum would tell the prosecutor in this respect. Unbeknownst to Baum, the conversation was tape recorded, and the government's draft transcript shows the following exchange:

> [THE CW]: ... Now, uh, as we see [the prosecutor]'s concern, let's go over [the prosecutor]'s, a, a, sticking point right, and it's not really not a sticking point, we just need to solve this. Let me ask you, we got to show [the prosecutor] a hundred thou-000.

---

4. In fact, the CW and Baum allegedly were discussing a "fee" substantially in excess of $100,-

sand dollars that I'm paying you, legitimate, right?

BAUM: Well, yeah, I mean, I hope I could say look—

[THE CW]: I gonna pay you in payments, we are, in increments—

BAUM: He wants to know where you're getting your money for up the hundred thousand that I get. Yes he said, and I, I, you know, can converse—

[THE CW]: Let's kick that around, how you suggest, what you—

BAUM: Truth.

[THE CW]: Because you know all my money is drug money, you know about that, I told you from day one. Let's come with a formidable plan.

BAUM: Somebody in your family or your mother, okay, has to have a benefactor in the Cuban community I would say, um, that's there to help you and that person has to be able to confirm that they are [the CW's] confidant [U/I]. I don't know how far things are gonna go [U/I].

. . . .

BAUM: What about your grandfather, do you have contact—

[THE CW]: No, uh, he's old, he's very old.

BAUM: Well, he's got money.

(5/14/98 Draft Tr. at 9–11).

The next day, Baum faxed a letter (dated May 14, 1998) to the government, in which he represented, among other things, that the CW's 92–year old grandfather was providing between $75,000 to $100,000, which purportedly was coming from legitimate sources, including, *inter alia*, the sales of a business and a house. According to the government, Baum knew that this representation was not true, and that Baum knew the money was not coming from the CW's grandfather or from any other legitimate source.

Following additional conversations with the prosecutor, Baum prepared and arranged to have the CW sign a declaration attesting to the purported facts that Baum had represented to the government, "facts" that Baum knew were not true. The declaration contained a caption, "United States of America - v[the CW], Defendant," and the CW represented in the declaration that:

I have retained Harvey Baum, Esq. in the above-referenced matter for the purpose of seeking a reduction of my sentences in federal district courts in the Southern District of New York and in the Eastern District of Wisconsin pursuant to Federal Rule of Criminal Procedure 35.

After the CW signed the declaration, Baum signed it himself, confirming that he was "counsel" for the CW, adopting the contents of the declaration, and declaring under penalty of perjury that, "[t]o the best of my knowledge, all of the information contained in [the CW's declaration] is true and accurate."

The May 26, 1998 meeting at which Baum obtained the declaration from the CW was also recorded, unbeknownst to Baum. The government's draft transcript shows the following exchange between Baum and the CW:

BAUM: ——to the best of my knowledge all the information is true and accurate (U/I) which means that if he thinks that I knowingly perjured—my license is grass—okay—so—(U/I)—

[THE CW]:—well—boy — all this shit— you believe it—let me tell you something, let me tell you something—

BAUM: You have nothing to lose, you have everything to gain, you know, you lose an opportunity, I lose my license, you know.

(5/26/98 Draft Tr.) (excerpt only).

Thereafter, Baum and Vasquez pressed the CW to pay them money in increments to fund the plan to lure Maya into the United States. On May 26, 1998, an undercover FBI agent, posing as a representative of the CW, met with Baum at his office and presented him with $15,000 in U.S. currency. On June 3, 1998, the same undercover agent delivered another $15,000 in cash to Baum. Baum did not report the receipt of the $30,-000 in cash to the Internal Revenue Service, as required by law.

## B. *Prior Proceedings*

The indictment in this case was filed on August 5, 1998. It contains six counts. Count One charges both defendants with

conspiracy to obstruct justice and to make false statements. The remaining five counts charge Baum with obstruction of justice (Count Two), making false statements (Counts Three, Four, and Five), and perjury (Count Six).

This motion followed.

## DISCUSSION

### A. *Section 1503*

The indictment in this case charges Baum with violating what is often referred to as the "omnibus clause" of 18 U.S.C. § 1503(a):

> Whoever corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice ... [commits a crime].[5]

Section 1503 has its roots in the Judiciary Act of 1789, which established the lower federal courts and granted them broad contempt power. *United States v. Reed*, 773 F.2d 477, 485 (2d Cir.1985); *see also United States v. Lundwall*, 1 F.Supp.2d 249, 252 (S.D.N.Y. 1998) (same). Until 1831, obstructive conduct that would now constitute a violation of § 1503 was punishable as contempt of court and was subject to a court's summary contempt powers. *Reed*, 773 F.2d at 485–86. In 1831, Congress amended the Judiciary Act of 1789 to provide that obstructive conduct outside the presence of a court was to be prosecuted according to "regular judicial procedures, including prosecution by indictment." *Id.* at 486 (citing Act of Mar. 2, 1831, ch. 99, 4 Stat. 487–88).

The 1831 amendments also created separate criminal penalties for "obstructive conduct that could not be addressed through the summary contempt power," including " 'corrupt overtures, out of court, to judges, jurors, or witnesses.' " *Lundwall*, 1 F.Supp.2d at 252 (quoting Nelles & King, *Contempt by Publication in the United States Since the* *Federal Contempt Statute*, 26 Colum. L.Rev. 525, 531 (1928)). These amendments were thus intended to make obstructive conduct occurring outside the presence of the court into a separately indictable offense.

■ The obstruction statute is intended to prevent the "obstruction of the due administration of justice in any court of the United States, corruptly or by threats of force." *Pettibone v. United States*, 148 U.S. 197, 207, 13 S.Ct. 542, 37 L.Ed. 419 (1893). The omnibus clause, in particular, "has been interpreted broadly in accordance with the congressional intent to promote the due administration of justice and to prevent the miscarriage of justice." *United States v. Cueto*, 151 F.3d 620, 631 (7th Cir.1998), *pet. for cert. filed*, No. 98–825, 67 U.S.L.W. 3364 (Nov. 18, 1998); *see also Lundwall*, 1 F.Supp.2d at 252 ("Cases analyzing § 1503 reinforce an understanding that § 1503 reaches an extensive range of misconduct. The broad scope of the statute and the evils it sought to combat ... was the "outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted ... [which are] limited only by the imagination of the criminally inclined." ' ") (quoting *United States v. Solow*, 138 F.Supp. 812, 815 (S.D.N.Y.1956) (Weinfeld, J.) (quoting *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir.1949))).

In *Pettibone*, the Court held that "a person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had notice that justice was being administered in such court." 148 U.S. at 206, 13 S.Ct. 542. Hence, the Court held that a person lacking knowledge of the "pendency of proceedings"

---

5. The full text of § 1503(a) reads:

Whoever corruptly, or by threats of force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats of force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, [commits a crime].

lacks the necessary intent to obstruct. *Id.* at 207, 13 S.Ct. 542.

Although the statute itself does not contain the words "pending proceeding," as a result of the Court's holding in *Pettibone,* the requirement of a "pending proceeding" for a conviction under § 1503 has become well established. *See, e.g., United States v. Fulbright,* 105 F.3d 443, 450 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1836, 137 L.Ed.2d 1041 (1997) ("[section] 1503 requires the government to prove the existence of a judicial 'proceeding' "); *United States v. Wood,* 6 F.3d 692, 695 (10th Cir.1993) ("there must be a pending judicial proceeding"); *Reed,* 773 F.2d at 485 ("the existence of an ongoing formal proceeding is an element of a § 1503 violation"); *see generally* Lisa R. Rafferty & Julie Teperow, *Obstruction of Justice,* 35 Am.Crim. L.Rev. 989, 993 (1998). It is on this basis that Baum moves to dismiss the obstruction of justice count in this case, arguing that there was no "pending proceeding" because the CW had already been convicted and sentenced and no Rule 35 motion had yet been filed.

### B. *Analysis*

Baum's contentions are rejected, for the language of the statute, its purpose, the case law, and policy considerations all strongly point to the conclusion that the conduct alleged in this case is proscribed by § 1503.

#### 1. *The Language of the Statute*

■ Section 1503 provides that "[w]hoever corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice" commits a crime. That language would certainly appear to cover the actions of a criminal defense attorney in knowingly making false representations to a prosecutor to induce the prosecutor to file a motion seeking a reduction in a convicted defendant's sentence.

■ Of course, a defendant's actions need not be successful to violate § 1503; it is enough that a defendant "endeavors" to influence the due administration of justice. *See United States v. Aguilar,* 515 U.S. 593, 599, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) ("[T]he endeavor must have the ' "natural and probable effect" ' of interfering with the due administration of justice.") (quoting, *inter alia, Wood,* 6 F.3d at 695). Here, if the government's allegations are true, Baum certainly was endeavoring to influence the due administration of justice—he was trying to persuade the government to file a Rule 35 motion to ask the sentencing judge to reduce the CW's sentence.

As noted, the statute does not explicitly refer to the existence of a "pending proceeding." To the extent the words "administration of justice"—which do appear in the statute—imply the existence of a "pending proceeding," they surely would encompass the proceedings against the CW. Although he had been sentenced and judgment had been entered, the sentence was not "final" in the sense that he still had the right to file a Rule 35 motion because substantially less than a year had elapsed since he had been sentenced. Hence, even though he had been sentenced, there were still "pending proceedings" in which he could file a Rule 35 motion.

#### 2. *The Purpose of the Statute*

■ Statutes should be construed to effectuate their purpose, *see Lundwall,* 1 F.Supp.2d at 251, and here Baum's alleged conduct clearly falls within the intent of the statute. If the government's allegations are true, Baum was trying to corruptly influence the administration of justice. In fact, Baum's scheme had no chance for success, as the CW was actually cooperating with the government. If Baum's scheme had succeeded as he contemplated, however, there indeed would have been a miscarriage of justice: a convicted drug dealer and murderer would have had his sentenced reduced under false pretenses while Baum and Vasquez were paid substantial sums of money obtained from illegal narcotics transactions.

The obstruction statute is intended to combat corrupt efforts to impede the proper administration of justice. If the government's allegations are correct, then Baum certainly sought to impede the proper administration of justice and his conduct surely falls within the broad scope of the statute.

Moreover, the "pending proceedings" requirement is intended to ensure that a defendant has notice that his corrupt actions will have the "natural and probable effect" of interfering with justice. Hence, in *Aguilar,* where a defendant made false statements to an FBI agent knowing that a grand jury had been convened but without knowing that his statements would be presented to the grand jury, and the defendant had not been subpoenaed or otherwise directed to appear before the grand jury, the Supreme Court held that the defendant did not have reasonable notice that his false statements would have "the natural and probable effect" of interfering with the due administration of justice. 515 U.S. at 599–601, 115 S.Ct. 2357.

In this case, the same cannot be said of Baum. If the government's allegations are true, he not only knew that his false statements would trigger a series of events intended to influence a judge into reducing the CW's sentence, but he specifically intended to influence judicial proceedings. Although his dealings were with the government and not the court, clearly he specifically intended to influence the sentencing judge himself. *See United States v. Polakoff,* 112 F.2d 888, 890 (2d Cir.) (Learned Hand, J.), *cert. denied,* 311 U.S. 653, 61 S.Ct. 41, 85 L.Ed. 418 (1940) ("Improperly to influence [the] function of the prosecuting attorney [to make a recommendation to the judge regarding sentence] would be a very successful way of impeding and obstructing the judge himself."). Hence, Baum had reasonable notice that his false statements would have "the natural and probable effect" of interfering with the due administration of justice.

### 3. *The Case Law*

Most of the cases addressing the issue of what constitutes a "pending proceeding" for purposes of the obstruction statute involve a defendant's conduct during the investigatory stage, before the filing of an indictment. *See, e.g., Wood,* 6 F.3d at 695 (10th Cir.1993) ("A grand jury investigation qualifies as a 'pending judicial proceeding' for purposes of the statute."); *United States v. Brown,* 688 F.2d 596, 598 (9th Cir.1982) (interference with execution of search warrant does not

constitute obstruction of justice for purposes of § 1503); *United States v. Ellis,* 652 F.Supp. 1451, 1452–53 (S.D.Miss.1987) (holding that no proceeding was pending for purposes of § 1503 when a grand jury had been empaneled, no subpoenas had been issued, and there was merely an oral agreement between U.S. Attorney's Office and state investigative agency to present case to grand jury).

There appear to be no cases in this Circuit addressing the existence of a "pending proceeding" in a situation where the defendant was charged with obstruction of justice *after* the completion of a case, for example, such as in this case, after conviction and sentencing. The few cases outside the Second Circuit, however, support the proposition that Baum's alleged conduct in this case was intended to affect a "pending proceeding."

In *United States v. Fernandez,* 837 F.2d 1031 (11th Cir.), *cert. denied,* 488 U.S. 838, 109 S.Ct. 102, 102 L.Ed.2d 78 (1988), the defendant's brother had been sentenced in separate criminal proceedings. Immediately following the sentencing, the defendant accosted the Assistant United States Attorney (the "Assistant") who had represented the government at the brother's sentencing. 837 F.2d at 1032–33. The defendant protested that his brother was innocent and shouted at the Assistant: "[Y]ou had better watch your back. You better get somebody to protect you." *Id.* at 1033. The defendant was prosecuted for, and convicted of, obstruction of justice in violation of § 1503 for threatening the Assistant.

On appeal, the defendant argued that because his brother had already been sentenced at the time of his conduct, his conviction under § 1503 was improper because there was no "pending proceeding." The Eleventh Circuit rejected the argument, holding:

[Defendant] assumes that [the Assistant]'s duties with respect to his brother's case ceased when the sentencing proceedings ended. This assumption, however, is incorrect, as [the Assistant] was still responsible for representing the government should the [defendant]'s brother take the available post-sentence steps of filing an

appeal or making a *motion to reduce his sentence.* Although [defendant]'s brother had not taken either action at the time of the attack, he still had time to file a notice of appeal ... and a *motion to reduce his sentence, see Fed.R.Crim.P. 35(b).* Under these circumstances, we cannot agree with the [defendant] that the case against [his brother] was no longer pending at the time he threatened [the Assistant].

837 F.2d at 1034 (emphasis added).

In *United States v. Johnson,* 605 F.2d 729 (4th Cir.1979), *cert. denied,* 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980), the defendant had been convicted of a crime at trial. While his appeal was pending, he attempted to cause the principal witness against him at trial to recant. He was then prosecuted for, and convicted of, obstruction of justice for his efforts to interfere with the witness. On appeal from the obstruction conviction, the defendant argued that his actions could not have affected the administration of justice because there was no proceeding pending. The court rejected the argument, holding that "for this purpose a criminal action remains pending in the district court until disposition is made of any direct appeal taken by the defendant assigning error that could result in a new trial." 605 F.2d at 731.[6]

In this case, when Baum and Vasquez embarked on their alleged scheme, the CW's time to appeal his conviction had not expired. More importantly, the one-year period for the government to file a Rule 35 motion on his behalf clearly had not elapsed. Hence, there remained a criminal action pending in the district court, one that Baum purportedly endeavored to obstruct. Hence, as the few cases on point suggest, Baum's alleged conduct falls within the ambit of § 1503.

**4.** *Policy Considerations*

Finally, policy considerations point strongly in favor of construing § 1503 to encompass an attorney's efforts to manipulate the government into filing a Rule 35 motion. Corrupt attorneys pose a grave threat to our adversarial system of justice, and as a matter of policy § 1503 should be interpreted broadly to combat that threat. As the Seventh Circuit recently held,

> If lawyers are not punished for their criminal conduct and corrupt endeavors to manipulate the administration of justice, the result would be ... the weakening of an ethical adversarial system and the undermining of just administration of the law.

*Cueto,* 151 F.3d at 632.

Unfortunately, all too often attorneys lose sight of their roles as advocates and officers of the court. They become too close to their clients or they become overzealous, or they simply succumb to greed. In the present case, if the government's allegations are true, a criminal defense attorney attempted to deceive the government into filing a Rule 35 motion for monetary gain. In another case before the Court, a criminal defense attorney pled guilty to obstructing justice by participating in a false cooperation scheme, which included creating a sham "stash" house, complete with planted narcotics, guns, and drug paraphernalia, which his client was going to "reveal" to the government in return for consideration in sentencing. *United States v. Stiso,* No. S3 97 Cr. 817(DC), 1998 WL 264830 (S.D.N.Y. May 21, 1998). There are countless other examples, including not just private attorneys but prosecutors and judges as well.[7]

**6.** In *United States v. Fulbright,* 105 F.3d 443, 450–51 (9th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 1836, 137 L.Ed.2d 1041 (1997), the defendant was a farmer who had filed for bankruptcy protection. He was convicted of obstruction of justice for sending threatening and harassing documents to the bankruptcy judge, some of which did not reach the bankruptcy judge until after the bankruptcy proceedings had been terminated and the time to appeal had lapsed. On appeal, the Ninth Circuit reversed the conviction, holding that because the bankruptcy proceedings had terminated and the time to appeal had lapsed with respect to at least some of the conduct, there was no "pending proceeding" with respect to at least some of the conduct, and it could not be determined upon which conduct the jury based its verdict.

**7.** *See, e.g., United States v. Cueto,* 151 F.3d 620 (7th Cir.1998), *pet. for cert. filed,* No. 98–825, 67 U.S.L.W. 3364 (Nov. 18, 1998) (attorney convicted of obstruction of justice for impeding and interfering with the FBI, the grand jury, and the federal district court, where his client was subject of federal racketeering investigation and

■ In some sense, of course, in a litigation context every attorney seeks to influence, on behalf of a client, the court or the government or a private adversarial party. An attorney may not do so, however, by corrupt means or for improper motivations. *See Cueto,* 151 F.3d at 631 ("[A]n individual's status as an attorney engaged in litigation-related conduct does not provide protection from prosecution for criminal conduct."); *United States v. Cintolo,* 818 F.2d 980, 990 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987) ("[T]he acceptance of a retainer by a lawyer in a criminal case cannot become functionally equivalent to the lawyer's acceptance of a roving commission to flout the criminal law with impunity. A criminal lawyer has no license to act as a lawyer-criminal.").

In this case, Baum's strategy at trial apparently will be to argue that in fact he did not act corruptly, that he was merely doing his job as a defense lawyer, and that he was genuinely trying to help a client help the government capture a major drug dealer. If the government's allegations are true, however, and its draft transcripts accurately capture Baum's conversations, then Baum's actions do not even come close to being permissible. If the government's allegations are true, then Baum used his license to practice law to attempt to perpetrate a fraud on the government, the court, and the public, for his own personal gain. *See Cintolo,* 818 F.2d at 1005 ("The facts of record ... show with stark clarity a defendant who used his license to practice law as a means of assisting an ongoing criminal conspiracy, consciously and corruptly—just as, say, the

driver of a getaway car might use his driver's license to a similar end."). If the government's allegations are true, then Baum did far more than drive the getaway car—he was the architect of the entire scheme. His actions surely would constitute a corrupt effort to interfere with the "due administration of justice," and as a matter of policy § 1503 should be construed accordingly.

### CONCLUSION

The motion to dismiss Count Two of the indictment is denied.

SO ORDERED.

prosecution, and the attorney misused his office as an attorney by, *inter alia,* falsely accusing a state liquor authority agent, who was working on the investigation, of fraud and by filing baseless motions to hinder the investigation and prosecution of his client); *United States v. Coiro,* 922 F.2d 1008 (2d Cir.), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (attorney convicted of conspiring to obstruct justice, where he helped organized crime clients create false stories to give to authorities, conceal evidence, and influence testimony of prospective witnesses, to obstruct pending law enforcement and grand jury investigations); *United States v. Cintolo,* 818 F.2d 980 (1st Cir.), *cert. denied,* 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987) (attorney convicted of conspiring to obstruct justice, where

the attorney used his position as attorney for a witness before the grand jury to acquire information about, and interfere in, loansharking investigation of another client). *See also* Janan Hanna, *DuPage 7 Trial Loose Ends Are Being Tied,* Chicago Tribune, Nov. 26, 1998, at 22 (prosecution of three former prosecutors and four sheriff's deputies accused of concocting evidence against death row inmate accused of murder of 10-year old girl); *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (federal district judge convicted of obstruction of justice and illegally disclosing a wiretap; Ninth Circuit reversed both convictions; Supreme Court affirmed the dismissal of the obstruction count, but reinstated the wiretap conviction).