**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Amiel CUETO, Defendant–Appellant.**

**No. 97–3439.**

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1998.

Decided July 31, 1998.

Miriam F. Miquelon (argued), Office of United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Nathan Z. Dershowitz, Victoria B. Eiger, Dershowitz & Eiger, New York City, Alan M. Dershowitz (argued), Cambridge, MA, Christopher Cueto, James K. Donovan, Cueto & Cueto, Belleville, IL, for Defendant–Appellant.

Mark R. Lippman, La Jolla, CA, Barbara E. Bergman, University of New Mexico, Albuquerque, NM, for Amicus Curiae.

Before BAUER, FLAUM, and MANION, Circuit Judges.

BAUER, Circuit Judge.

After a jury trial, Amiel Cueto was convicted of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and three counts of obstruction of justice, in violation of the omnibus clause of 18 U.S.C. § 1503. The district court sentenced Cueto to 87 months imprisonment and imposed monetary penalties. Cueto now appeals his convictions and sentence, arguing that: (1) the conviction for conspiracy to defraud is invalid because of constitutional infirmities as well as insufficiency of the evidence; (2) the convictions for obstruction of justice are also invalid because of constitutional infirmities and insufficiency of the evidence; (3) he is entitled to a new trial because the district court erroneously excluded certain defense evidence; and (4) his sentence should be vacated and remanded because the district court erroneously calculated his sentence. For the following reasons, we affirm.

## BACKGROUND

Thomas Venezia owned B & H Vending/Ace Music Corporation ("B & H"), a vending and amusement business, and operated an illegal video gambling business through a pattern of racketeering activities and illegal gambling payouts, in violation of state and federal anti-gambling and racketeering laws. Venezia hired Amiel Cueto, an attorney, to represent him as well as to defend the tavern owners associated with B & H in the event of any arrests and/or criminal charges for their participation in the illegal gambling operation. In March of 1995, Venezia and B & H were indicted on federal racketeering charges, in addition to other related charges including illegal gambling.[1] Throughout the investigation and prior to Venezia's indictment, Cueto served as Venezia's lawyer and advisor. Cueto was not Venezia's attorney of record during the trial; nonetheless, the record indicates that Venezia continued to rely on Cueto's advice throughout the prosecution of the racketeering case.

On December 2, 1995, Venezia and B & H were convicted of racketeering, illegal gambling, and conspiracy arising out of the oper-

---

1. The charges alleged that B & H supplied video poker games to various liquor-selling establishments on which the tavern owners provided illegal gambling payouts to its customers. B & H then reimbursed the tavern owners for the money they paid out on the video games and shared with the owners any profits the games earned.

ation of the illegal gambling business. *United States v. B & H Vending/Ace Music Corp. & Thomas Venezia, et al.*, No. 95–30024. Seven months later, another federal grand jury returned a second indictment naming Cueto, Venezia, and Robert Romanik, a local public official and investigator who worked for Cueto and Venezia. They were charged with, *inter alia*: (1) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and (2) obstruction of justice, in violation of the omnibus clause of 18 U.S.C. § 1503, for their conduct throughout the investigation of Venezia and his illegal gambling operation and the indictment and prosecution of the racketeering case. This second indictment is the impetus for the current appeal.

To understand the context of the instant indictment, convictions, and appeal, we examine the nature and scope of Cueto's relationship with Venezia, his association with the illegal gambling operation, and his involvement in the investigation, indictment, and prosecution of Venezia, the illegal gambling operation, and the racketeering enterprise. In 1987, Venezia purchased a vending and amusement business, later known as B & H, which operated an illegal video gambling business for about eight years. B & H supplied video poker games to local bars in the metropolitan area of East St. Louis, Illinois, including a Veterans of Foreign Wars Post ("VFW") on Scott Air Force Base, and the tavern owners agreed to make illegal gambling payouts to its customers.[2] State agents believed the video games were being used for illegal gambling purposes, and beginning in 1992, the Illinois Liquor Control Commission ("ILCC") and the State Police initiated a joint investigation in St. Clair County, which targeted illegal gambling operations in Southern Illinois.

The ILCC has broad investigatory powers to supervise liquor licensees, and ILCC Agent Bonds Robinson worked on the task force and investigated the gambling operations in cooperation with the state police. Initially, Robinson worked in a non-undercover capacity as part of the state investigation to determine, in the course of routine liquor inspections, whether any establishment was making illegal gambling payouts. Agents of the ILCC began to strictly enforce the gambling regulations and frequently visited the taverns to ensure compliance. Eventually, the FBI became interested in the state's investigation, and ultimately decided to use Robinson in a federal investigation of illegal gambling operations in St. Clair County, particularly Venezia's gambling operation.[3] At some later point, Robinson assumed an undercover role for the FBI as a corrupt liquor agent in an attempt to gather evidence against Venezia and B & H. Soon thereafter, the state police raided the VFW Post, seized B & H's video poker games, and arrested two VFW employees for maintaining an illegal gambling establishment. After the raid, Venezia and B & H supplied additional video games to the VFW, which continued to provide its customers with illegal gambling payouts.

In an attempt to gather evidence, Robinson, who was present at the VFW raid, indicated that Venezia could avoid further interruptions of his illegal gambling operation if he were to offer a bribe to discourage the investigation and the interference, and he suggested to Venezia that they meet. Venezia consulted with Cueto, who instructed Venezia to meet with Tom Daley, one of his law partners at the time. In an attempt to portray Robinson as a dishonest agent, Daley reported to the ILCC that Robinson had solicited a bribe at the VFW. A meeting was then scheduled between Venezia and Robinson, who met at B & H corporate headquarters. Robinson taped the conversation at the FBI's request, and the tape was introduced into evidence in the racketeering case and at Cueto's trial.[4] Soon after the meeting, the

---

2. Video games that swallow pocket change and "pay off" in game replays are unobjectionable; but if the owner of an establishment pays winners in cash or liquor, then it is a violation of Illinois anti-gambling laws.

3. When the FBI decided to use Robinson in its investigation of the illegal gambling operations, he was already working for the FBI in an undercover capacity in an unrelated investigation involving illegal prostitution and racketeering.

4. Of course, the defendant and the government have conflicting opinions about the substance of the conversation and whether a bribe was solicited for investigatory or criminal purposes.

VFW was raided again; B & H video poker games were seized, and two employees were arrested. The ILCC issued an administrative violation to the VFW as well as a warning to remove the illegal gambling machines, otherwise, its liquor license would be revoked. Again, Venezia consulted with Cueto about the raids, the criminal charges, and the prosecutions, and they discussed available options and courses of action.

First, Cueto and Venezia drafted a letter, detailing Robinson's alleged "corrupt" conduct and accusing him of soliciting bribes, and delivered it to St. Clair County State's Attorney Robert Haida. Cueto also filed a complaint in state court against Robinson, in which Cueto alleged that Robinson was a corrupt agent. *See Venezia v. Robinson*, No. 92–CH 299. Cueto obtained a court order that required Robinson to appear for a hearing in *People v. Moore*, one of the gambling prosecutions arising from the VFW raid.[5] Pursuant to the order, Robinson appeared in state court, and Cueto immediately served him with a subpoena, which required him to appear in court within fifteen minutes for an injunction hearing in *Venezia v. Robinson*. Cueto had prepared a petition, requesting either a temporary restraining order or a preliminary and permanent injunction against alleged extortion and other vexation to prevent Robinson from interfering with the operation of Venezia's business. Robinson had not seen a copy of the complaint, had not been served with process, and was not represented by counsel.

At the hearing, Robinson's requests for an attorney were denied, and the state court judge permitted Cueto to question Robinson about the FBI's investigation (which at that point was still a covert operation) and the evidence it had obtained in the course of the investigation. Without permitting Robinson to put on a defense and without articulating any findings of fact or conclusions of law, the state court entered a preliminary injunction against Robinson, which indefinitely enjoined him from interfering with Venezia's business operations. Venezia then returned to the

VFW, as well as other taverns affiliated with the gambling operation, to advise them that a state court judge had entered an injunction against Robinson and that he could no longer interfere with their establishments and the illegal gambling operation.

Notwithstanding the injunction and pursuant to instructions from the Director of ILCC to continue his routine liquor inspections, Robinson visited another establishment associated with B & H's gambling operation and discovered that the tavern owner was providing illegal gambling payouts on some of the video machines. Thereafter, Dorothy McCaw was arrested for operating and maintaining an illegal gambling establishment, and she signed a written confession for her participation in illegal gambling activities. Upon learning of the inspection and arrest, Venezia contacted Cueto, who arranged for Venezia and Romanik, the third individual charged in the instant indictment, to obtain another statement from McCaw. Cueto then drafted a letter to the ILCC, State's Attorney Haida, the Office of the United States Attorney for the Southern District of Illinois, and the FBI, claiming that his client was suffering damage as a result of Robinson's "unlawful" interference with the operation of Venezia's business and threatened that if the conduct continued, he would file suit against the ILCC, in addition to Robinson, for damages incurred. Without McCaw's knowledge, Cueto attached to that letter the statement she had given to Venezia and Romanik, which supported Cueto's allegations of interference. Cueto also filed a rule to show cause in state court, which described Robinson's violations of the injunction and requested the court to find him in contempt; McCaw's statement also was attached to the rule to show cause, again without her knowledge.

Represented by the Office of the United States Attorney for the Southern District of Illinois, Robinson filed a motion to remove the rule to show cause in *Venezia v. Robinson* to federal district court pursuant to 28

---

**5.** At trial, Cueto admitted that he obtained the court order for unlawful purposes and that he fraudulently used the court order to lure Robinson to court for the injunction proceedings. *See*

Trial Transcript, Volume 27 at 72–73, 95 (hereinafter all references to the transcript of the trial are cited as "Transcript, Volume: Page").

U.S.C. § 1442(a)(1). In the removal proceeding, the district court determined that Robinson had been working for the FBI under the control of a federal agent during the VFW raids, which therefore established federal jurisdiction. After removal, the district court dissolved the injunction and dismissed the complaint. *Venezia v. Robinson*, No. 92 CV 867. Cueto filed an appeal in this court, challenging the dissolution of the injunction and the dismissal of the complaint. Recognizing that the injunction hearing had violated Robinson's rights to due process, we affirmed the district court's order. *Venezia v. Robinson*, 16 F.3d 209 (7th Cir.1994). Cueto filed a petition for certiorari in the Supreme Court, which also was denied. *See* 513 U.S. 815, 115 S.Ct. 71, 130 L.Ed.2d 26 (1994).

During the investigation, the record indicates that Cueto and Venezia developed more than a professional attorney-client relationship, entering into various financial transactions and business deals, some of which involved secret partnerships. A few examples include: (1) they purchased unimproved real estate, developed the real estate, built and managed a topless nightclub (Club Exposed), which operated some of B & H's illegal gambling machines; (2) Venezia and Cueto incorporated Millennium III, an asbestos removal company, and applied for and obtained a $600,000 line of credit to complete the purchase acquisition; and (3) Venezia purchased Cueto's office building and moved B & H corporate headquarters into it. The record demonstrates that in order to obtain financing, Venezia reported B & H as a principal asset on his financial statements and loan applications to establish the necessary credit he and Cueto needed to become joint borrowers on various loans. Moreover, the record indicates that the lender in the Millennium purchase relied upon Venezia's financial statement in its decision to loan the money for the acquisition. *See* Transcript, 19:112–113.

About the time the Millennium purchase was finalized, state police and Robinson arrested George Vogt, a B & H customer, for gambling. At a hearing in the state's prosecution of Vogt, Robinson testified and Cueto cross-examined him. After the hearing, Cueto again approached State's Attorney Haida, provided him with the transcripts from the *Vogt* hearing, and urged Haida to indict Robinson for perjury. Thereafter, Haida commenced an investigation of Robinson's activities. Nothing came of Cueto's allegations of perjury, and the investigation ended without any charges being filed.

The investigation of Venezia and B & H began in early 1992, and the events discussed above occurred over a period of approximately three years. We briefly mentioned some of the initial business and financial dealings between Venezia and Cueto, but to avoid an even longer discussion of these background facts, we think it unnecessary to specifically discuss every financial transaction contained in the record except to point out that together Venezia and Cueto participated in various business transactions, in which millions of dollars exchanged hands to finance the purchases of various real· estate interests and construction costs relating to various development projects, including certain gambling operations.[6] The indictment specifically charged that Club Exposed, the nightclub owned by Venezia and Cueto, Millennium III, as well as other business transactions in which they were involved, depended upon the continued operation of B & H and the illegal gambling business to secure and to cover the various loans and debts they incurred in their financial ventures.

Even after Cueto became a business partner of Venezia and invested in various real estate and development projects with him, he continued to give Venezia legal advice. Although Cueto was not an attorney of record, he participated in the preparation of Venezia's defense in the racketeering prosecution. Cueto continued to urge State's Attorney Haida to indict Robinson for perjury. He also contacted Congressman Jerry Costello, who owned an equal one-third partnership interest in a gambling development project with Cueto and Venezia, and asked the Congressman to contact Haida and to offer him a seat on the judiciary in exchange for Haida's

---

**6.** The government submitted a summary exhibit of the joint business transactions engaged in by Venezia and Cueto from 1991 until 1995. *See* Trial Exhibit # 276.

recommendation that Cueto be appointed as the next State's Attorney. Cueto also began to publish a newspaper, the *East Side Review*, and authored an article in which he indicated that in the next election he intended to run for St. Clair County State's Attorney, and in the event he was elected, he would prosecute Robinson.[7]

In August of 1994, the government empaneled a grand jury to examine the evidence obtained in the FBI's investigation of Venezia and B & H, and the grand jury also initiated its own investigation of these allegations. In response, Cueto prepared and filed various motions to hinder the investigation and to discharge the grand jury, all of which were denied. Notwithstanding the defense tactics and delays, the grand jury indicted Venezia, among others; he was prosecuted, and ultimately, convicted for operating an illegal gambling enterprise, in addition to other related convictions.

Seven months after the racketeering convictions in July of 1996, another grand jury returned a separate nine count indictment against Cueto, Venezia, and Romanik. It is this indictment and the subsequent convictions on various counts of this indictment that are the subject of this appeal.[8] Count 1 of the indictment charged Cueto in a three-part conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, alleging that he misused his office as an attorney and unlawfully and intentionally conspired with Venezia and Romanik to impede, impair, obstruct, and defeat the lawful function of the FBI, the grand jury, and the federal district court in connection with the investigation, indictment, and prosecution of Venezia, B & H, and the illegal gambling operation and racketeering enterprise. The indictment al-

leged that Cueto and Venezia's business relationship created Cueto's financial motive for his participation in the conspiracy, in which he endeavored to protect the illegal gambling enterprise and to maintain its continued operation in order to safeguard his personal financial interests.

In the first part of the conspiracy, the government charged that Cueto conspired to impede and delay the FBI investigation primarily by attacking the reputation of ILCC Agent Bonds Robinson and by urging the St. Clair County State's Attorney to investigate, indict, and prosecute Robinson for alleged extortion. Second, the indictment alleged that Cueto conspired to influence and hinder the function of the grand jury by filing false motions, which attacked the operations of the FBI and the Office of the United States Attorney, in an attempt to delay and disrupt the investigation and to discharge the grand jury. Finally, the third aspect of the conspiracy focused on Cueto's attempts to obstruct the proceedings in federal district court by persuading Venezia's (and his co-defendants') defense counsel to file various motions, including a motion to disqualify the district court judge assigned to hear the racketeering case.

Counts 2, 6, and 7 of the indictment charged obstruction of justice in violation of the omnibus clause of 18 U.S.C. § 1503,[9] alleging that Cueto corruptly endeavored to use his office as an attorney to influence, obstruct, and impair the due administration of justice in various court proceedings in connection with the prosecution of Venezia, his illegal gambling operation, and the racketeering enterprise in *United States v. B & H Vending/Ace Music Corp. & Thomas Venezia, et al.* Specifically, Count 2 of the indict-

---

7. In the *East Side Review*, Cueto also authored and published various articles in which he complained of prosecutorial misconduct in association with the racketeering case and attacked the integrity and reputations of various Assistant United States Attorneys involved in the indictment and prosecution of the racketeering case.

8. For purposes of this opinion, we only discuss the counts for which Cueto was convicted: Counts 1, 2, 6, and 7. Cueto was acquitted of the charges in Counts 3, 4, and 8. Romanik pleaded guilty to Count 5 of the instant indictment for lying to the grand jury. Pursuant to a deal made

with the government, Venezia pleaded guilty to the crimes charged in the indictment and testified at Cueto's trial in exchange for the government's recommendation that his 15 year sentence in the illegal gambling and racketeering case be reduced to the lower end of the Sentencing Guidelines, which would result in a reduction from 15 years to 10 years.

9. Hereinafter, all statutory references are to Title 18 of the United States Code unless otherwise indicated.

ment charged that Cueto corruptly endeavored to influence the due administration of justice in *Venezia v. Robinson* by filing or causing to be filed pleadings in connection with the proceedings in federal district court, an appellate brief in this court, and a petition for certiorari to the United States Supreme Court. Count 6 involved Cueto's actions in regard to ILCC Agent Bonds Robinson, and the indictment charged that Cueto corruptly endeavored to obstruct the lawful function of the federal grand jury in his attempts to encourage and to persuade State's Attorney Haida to indict Robinson. Count 7 also focused on the filing of various court papers, and the indictment alleged that Cueto corruptly endeavored to influence, obstruct, and impede the proceedings in federal district court by preparing and filing and urging defense counsel to prepare and file false pleadings and court papers in connection with the racketeering case.

After a jury trial, Cueto was convicted of the charges in Counts 1, 2, 6, and 7 and the district court ordered him to serve a prison term of 87 months, to be followed by two years of supervised release, and imposed monetary penalties. Cueto filed a timely notice of appeal. He asserts several arguments on appeal, challenging his convictions and sentence. First, Cueto contends that the conviction for conspiracy to defraud the government is invalid, arguing that: (1) the meaning of "conspiracy to defraud" in § 371 is unconstitutionally vague as applied to the conduct charged in the indictment; and (2) his conviction may rest on a constitutionally or legally invalid theory because the conduct charged in the indictment includes lawful conduct that was undertaken openly and in public view. Next, Cueto challenges each conviction for obstruction of justice in violation of the omnibus clause of § 1503 as invalid, arguing that: (1) the omnibus clause of § 1503 is unconstitutionally vague as applied to the conduct charged in the indictment; (2) the omnibus clause of § 1503 does not cover either the filing of court papers or attempts to encourage a state prosecutor to investigate another state official for misconduct; (3) the conduct charged fails to satisfy the nexus requirement as articulated by the Supreme Court in *United States v. Aguilar*, 515 U.S.

593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995); and (4) an attempt to persuade a prosecutor to take action against a state officer for misconduct is speech protected by the First Amendment.

Cueto also asserts that he is entitled to a new trial because the district court erred when it excluded certain defense evidence: (1) the transcript of the state injunction hearing in *Venezia v. Robinson*; (2) Robinson's testimony at a hearing in one of the state's gambling prosecutions, *People v. Vogt*, arising from Venezia's illegal gambling operation; and (3) Venezia's grand jury testimony, which Cueto wanted to use for impeachment purposes. He also claims that the district court erred by redacting portions of certain documents and newspaper articles. Finally, Cueto argues that his sentence should be vacated and remanded because the district court judge erroneously calculated his sentence by not grouping the obstruction of justice convictions. With these facts as background, we now consider the issues presented for review and examine each argument in turn.

### ANALYSIS

■ Before we begin our analysis, we discuss the appropriate standard of review, our particular role in this review, and the limited scope of this decision. Our ruling today does not interfere with legitimate avenues of advocacy of even the most zealous of attorneys; we do nothing more than consider the constitutionality of certain criminal statutes aimed at protecting the sanctity and integrity of our justice system from corrupt influences and apply them in a sober and impartial fashion. Ultimately, we consider the sufficiency of evidence presented by the prosecution in our review of the jury's guilty verdict. Appellate review of a jury's verdict is limited; if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt, we are bound to affirm the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We have repeatedly recognized that defendants challenging the sufficiency of the evidence at trial face a "nearly insurmountable hurdle." *See,*

**630**

*e.g., United States v. Moore,* 115 F.3d 1348, 1363 (7th Cir.1997) (citing other cases).

 In reviewing the sufficiency of the evidence in a criminal case, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original); *see also United States v. Jackson,* 103 F.3d 561, 567 (7th Cir.1996). We defer to the jury's credibility determinations, its weighing of the evidence, and its drawing of reasonable inferences and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt. *Moore,* 115 F.3d at 1363. With that said, we recognize that the defendant asserts various other arguments challenging his convictions and sentence, and we discuss those standards of review at the point in our analysis when we consider those alternative arguments.

I. OBSTRUCTION OF JUSTICE

 Cueto asserts several arguments with respect to his convictions on Counts 2, 6, and 7 for obstruction of justice, contending that the omnibus clause of § 1503 is unconstitutionally vague as applied to the conduct charged in the indictment and, alternatively, that the evidence established at trial on these counts is insufficient to support his convictions. We address each argument in turn and begin with the constitutional challenges. Cueto argues that "much of what lawyers *do*—are attempts to influence the justice system," and that the omnibus clause of § 1503 was not intended to apply to the type of conduct charged in the indictment. Appellant's Brief at 17 (emphasis in original). Questions regarding the constitutionality or scope of a statute are reviewed *de novo. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497–98, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

 "[I]n determining the scope of a statute, one is to look first at its language. If the language is unambiguous, ordinarily it is to be regarded as conclusive unless there is

'a clearly expressed legislative intent to the contrary.'" *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983) (internal citations omitted) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). The omnibus clause of § 1503 is a catch-all provision that states:

> Whoever ... *corruptly* or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes or *endeavors* to influence, obstruct or impede, the due administration of law, shall be imprisoned....

18 U.S.C. § 1503 (emphasis added). This clause was intended to ensure that criminals could not circumvent the statute's purpose "by devising novel and creative schemes that would interfere with the administration of justice but would nonetheless fall outside the scope of § 1503's specific prohibitions." *United States v. Tackett,* 113 F.3d 603, 607 (6th Cir.1997). "The obstruction of justice statute was drafted with an eye to 'the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.'" *United States v. Griffin,* 589 F.2d 200, 206 (5th Cir.1979) (citation omitted).

 Cueto also contends that the vagueness problems are exacerbated by this court's broad construction of the term "corruptly," arguing that it fails to provide meaningful and adequate notice as to what conduct is proscribed by the statute. The Seventh Circuit has approved a jury instruction which articulates a definition for the term "corruptly," and the district court judge included this definition in its instructions to the jury:

> Corruptly means to act with the purpose of obstructing justice. The United States is not required to prove that the defendant's only or even main purpose was to obstruct the due administration of justice. The government only has to establish that the defendant should have reasonably seen that the natural and probable consequences of his acts was the obstruction of

justice. Intent may be inferred from all of the surrounding facts and circumstances. Any act, by any party, whether lawful or unlawful on its face, may violate Section 1503, if performed with a corrupt motive. *See* Transcript, 32:68–69. The mere fact that a term "covers a broad spectrum of conduct" does not render it vague, and the requirement that a statute must give fair notice as to what conduct is proscribed "cannot be used as a shield by one who is already bent on serious wrongdoing." *Griffin*, 589 F.2d at 206–207.

▆▆▆ There is little case authority directly on point to consider whether an attorney acting in his professional capacity could be criminally liable under the omnibus clause of § 1503 for traditional litigation-related conduct that results in an obstruction of justice. "Correct application of Section 1503 thus requires, in a very real sense, that the factfinder discern—by direct evidence or from inference—the motive which led an individual to perform particular actions.... 'Intent may make any otherwise innocent act criminal, if it is a step in a plot.'" *United States v. Cintolo*, 818 F.2d 980, 991 (1st Cir.1987) (quoting *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916)). Therefore, it is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids. *See Cintolo*, 818 F.2d at 992 ("means, though lawful in themselves, can cross the line of illegality if (i) employed with a corrupt motive, (ii) to hinder the due administration of justice, so long as (iii) the means have the capacity to obstruct").

▆▆▆ We are not persuaded by Cueto's constitutional challenges, and his focus is mis-placed. The government's theory of prosecution is predicated on the fact that Cueto held a personal financial interest in protecting the illegal gambling enterprise, which formed the requisite corrupt intent for his conduct to qualify as violations of the statute.[10] Cueto focuses entirely on the legality of his conduct, and not the requisite criminal intent proscribed by § 1503. It is undisputed that an attorney may use any *lawful* means to defend his client, and there is no risk of criminal liability if those means employed by the attorney in his endeavors to represent his client remain within the scope of lawful conduct. However, it is the corrupt endeavor to protect the illegal gambling operation and to safeguard his own financial interest, which motivated Cueto's otherwise legal conduct, that separates his conduct from that which is legal.

▆▆▆ Even though courts may be hesitant, with good reason and caution, to include traditional litigation-related conduct within the scope of § 1503, the omnibus clause has been interpreted broadly in accordance with congressional intent to promote the due administration of justice and to prevent the miscarriage of justice, and an individual's status as an attorney engaged in litigation-related conduct does not provide protection from prosecution for criminal conduct. *Aguilar*, 515 U.S. at 599, 115 S.Ct. 2357; *see also United States v. Goulding*, 26 F.3d 656, 665 (7th Cir.1994); *Cintolo*, 818 F.2d at 990 ("a criminal lawyer has no license to act as a lawyer-criminal"). Cueto's arguments have no merit. As a lawyer, he possessed a heightened awareness of the law and its scope, and he cannot claim lack of fair notice as to what conduct is proscribed by § 1503 to shield himself from criminal liability, particularly when he was already "bent on serious wrongdoing." *Griffin*, 589 F.2d at 206–207. More so than an ordinary individual, an attorney, in particular a criminal defense attorney, has a sophisticated understanding of the type of

---

**10.** This theory of prosecution brings us some pause. With the government's emphasis on Cueto's involvement in Venezia's illegal gambling operation and the racketeering enterprise, we are puzzled why the government did not indict and prosecute Cueto in the underlying racketeering case for his participation in the illegal gambling operation. Although the government's decision not to prosecute Cueto in the previous case is fundamentally inconsequential to the instant appeal, we are concerned about the relationship between the instant appeal and the underlying prosecution of the gambling operation and the racketeering enterprise.

conduct that constitutes criminal violations of the law. There is a discernable difference between an honest lawyer who unintentionally submits a false statement to the court and an attorney with specific corrupt intentions who files papers in bad faith knowing that they contain false representations and/or inaccurate facts in an attempt to hinder judicial proceedings. It is true that, to a certain extent, a lawyer's conduct influences judicial proceedings, or at least attempts to affect the outcome of the proceedings. However, that influence stems from a lawyer's attempt to advocate his client's interests *within the scope of the law*. It is the "corrupt endeavor" to influence the due administration of justice that is the heart of the offense, and Cueto's personal financial interest is the heart of his corrupt motive.

An amicus brief submitted by the National Association of Criminal Defense Lawyers ("Association") also questions the proper scope of the omnibus clause of § 1503, and the Association articulates its fears that if we affirm Cueto's convictions, criminal defense attorneys will be subject to future prosecutions not only for actual misconduct, but also for apparent and inadvertent wrongdoing, notwithstanding a lawyer's good faith advocacy. The Association believes that this type of sweeping prosecution will sufficiently chill vigorous advocacy and eventually destroy the delicate balance between prosecution and defense which is necessary to maintain the effective operation of the criminal justice system. Although the Association discusses valid policy concerns and asserts legitimate arguments, some of which we generally agree with, we are also concerned with the flipside of its argument. If lawyers are not punished for their criminal conduct and corrupt endeavors to manipulate the administration of justice, the result would be the same: the weakening of an ethical adversarial system and the undermining of just administration of the law. We have the responsibility to ensure that the integrity of the criminal justice system is maintained and that protection includes granting to both the prosecution and the defense flexibility and "discretion in the conduct of the trial and the presentation of evidence," *Imbler v. Pachtman*, 424 U.S. 409, 426, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), in addition to enforcing mechanisms of punishment, which necessarily include criminal prosecution, to prevent abuses of the system.

We have carefully examined the fears articulated by the National Association of Criminal Defense Lawyers, in addition to the arguments put forth by the defendant, that a decision upholding the application of the omnibus clause of § 1503 to litigation-related conduct may deter or somehow chill the criminal defense lawyers in zealous advocacy, and we find those concerns to be exaggerated, at least as considered in light of the facts in the present case. Although we appreciate that it is of significant importance to avoid chilling vigorous advocacy and to maintain the balance of effective representation, we also recognize that a lawyer's misconduct and criminal acts are not absolutely immune from prosecution. We cannot ignore Cueto's corrupt endeavors to manipulate the administration of justice and his clear criminal violations of the law. As the First Circuit recognized in *Cintolo*:

> Nothing in the caselaw, fairly read, suggests that lawyers should be plucked gently from the maddening crowd and sheltered from the rigors of 18 U.S.C. § 1503 in the manner urged by appellant and by the amici. Nor is there sufficient public policy justification favoring such a result. To the contrary, the overriding public policy interest is that "[t]he attorney-client relationship cannot ... be used to shield or promote illegitimate acts...." "[A]ttorneys, just like all other persons, ... are not above the law and are subject to its full application under appropriate circumstances."

818 F.2d at 993–94 (internal citations omitted). Accordingly, we conclude that the omnibus clause of § 1503 may be used to prosecute a lawyer's litigation-related criminality and that neither the omnibus clause of § 1503 nor this court's construction of the term "corruptly" is unconstitutionally vague as applied to the conduct charged in the indictment for which Cueto was convicted.

 We now turn to Cueto's argument that his convictions on the obstruction of justice counts were not supported by suffi-

cient evidence. Cueto's task is a formidable one, and an examination of the record illuminates that the evidence presented in this case overwhelmingly supports the jury's verdict. In order to establish a violation of § 1503, the government must demonstrate that: (1) there was a pending judicial proceeding; (2) the defendant knew of the proceeding; (3) he influenced, obstructed, or impeded, or endeavored to influence, obstruct or impede the due administration of justice; and (4) he did so corruptly. *United States v. Maloney*, 71 F.3d 645, 656 (7th Cir.1995). There must be a nexus between the defendant's efforts and the judicial proceeding sought to be corruptly influenced. *Aguilar*, 515 U.S. at 598–599, 115 S.Ct. 2357. However, a defendant's actions need not be successful in order to be prosecuted under the statute. All that is required is that the defendant has knowledge or notice that his actions are likely to affect the just administration of the subject proceedings. *Id.*

Again the focus of Cueto's argument is misplaced; he argues that his conduct does not fall within the scope of the omnibus clause of § 1503 and that the government presented insufficient evidence to demonstrate his guilt. Cueto, however, fails to address the essence of the government's allegations and, ultimately, the basis for his convictions; it is his corrupt endeavor to obstruct the administration of justice that transforms his traditional litigation-related conduct into criminal violations of the law. The gloss which Cueto places on the evidence manifestly misapprehends both the jury's fact finding function and our role in the review of the verdict. In light of the considerable circumstantial evidence in support of its assessment of the situation, the jury was reasonably entitled to disbelieve Cueto's characterization of his conduct and to accept the contrary interpretation urged by the government that Cueto, with a corrupt purpose, endeavored to obstruct the due administration of justice. That finding cannot be lightly overturned. Indeed, the record adequately supports the conclusion that Cueto's conduct, though nominally litigation-related conduct on behalf of his client, was undertaken with the corrupt intent to protect Venezia, Venezia's associates, and his busi-

ness from criminal prosecution and to safeguard his personal financial interest in the illegal gambling operation, whatever the costs and consequences to the due administration of justice.

■ The charges in Count 2 of the indictment included allegations of a corrupt endeavor to obstruct the due administration of justice in *Venezia v. Robinson* by filing pleadings in federal district court and a continued attempt to hinder the proceedings by filing an appeal in this court and a petition for certiorari in the United States Supreme Court. The evidence demonstrates that Cueto successfully exposed the FBI's investigation, uncovered the evidence it had gathered, obtained the injunction against Robinson, and continued to file frivolous appeals after the district court dismissed the injunction and the complaint. *See* Transcript, 15:62–63; 16:71–72. Government agents, in fact, testified that the investigation was disrupted and that Cueto "blew the lid off the ongoing investigation." *See* Transcript, 3:44; 16:55–59. The jury was amply justified in concluding that Cueto's repeated filings were motivated by his attempt to protect his client from prosecution and to safeguard his financial interest. Cueto's actions may qualify as traditional litigation-related conduct in form, but not in substance, and the evidence presented at trial demonstrates that Cueto clearly intended and corruptly endeavored to obstruct the due administration of justice in *Venezia v. Robinson*.

■ Similar to Count 2, Count 7 includes allegations of preparing and filing and causing defense counsel to prepare and file false pleadings and other court papers; the indictment specifically charged Cueto with encouraging defense counsel in the racketeering case to file false motions and pleadings for the purpose of impeding and obstructing the administration of justice in that case. We have no doubt that Cueto in fact intended to interfere with the investigation, attempted to delay the indictment, and endeavored to obstruct the proceedings in federal district court in connection with the prosecution of Venezia. *See* Transcript, 23:74; 25:17. We simply are not dealing with non-corrupt, le-

gitimate involvement in the preparation of Venezia's (and his co-defendants') defense. Nor are we dealing with inadvertent interference. From the evidence presented at trial, the jury was amply justified in concluding without a doubt that Cueto corruptly endeavored to obstruct the district court's proceedings in the gambling and racketeering prosecution.

In response to his conviction on Count 6, Cueto argues that his conviction should be reversed because the *Aguilar* nexus is absent; he contends that the government presented insufficient evidence to establish the relationship between his attempts to persuade State's Attorney Haida to investigate and indict Robinson and a pending judicial proceeding.[11] Cueto contends that at the time the conduct charged in the indictment occurred, the grand jury had not yet been empaneled and that Venezia had not been indicted in the racketeering case, and therefore the nexus is lacking. His argument, however, mischaracterizes the frame of time at issue in addition to the indictment and the charges therein. "It is well established that investigations undertaken with the intention of presenting evidence before a grand jury are sufficient to constitute 'the due administration of justice' under § 1503." *Maloney*, 71 F.3d at 657.

Though Cueto's initial calls and letters to State's Attorney Haida may pre-date the empaneling of the grand jury, the phone call to Congressman Costello occurred after the indictment was unsealed. In addition, his letters to the State's Attorney occurred throughout the investigation, and the evidence indicates that Cueto knew of the investigation. Accordingly, Cueto's conduct prior to the empaneling of the grand jury as well as his subsequent acts to encourage State's Attorney Haida to investigate and prosecute

Agent Robinson have the requisite nexus to the judicial proceedings; there was sufficient evidence presented at trial for a rational trier of fact to conclude beyond doubt that Cueto repeatedly attempted to urge Haida to prosecute Robinson knowing that an investigation into Robinson's conduct would hinder the government's ability to continue to investigate Venezia and the gambling operation.

Whatever the contours of the line between traditional lawyering and criminal conduct, they must inevitably be drawn case-by-case. We refuse to accept the notion that lawyers may do anything, including violating the law, to zealously advocate their clients' interests and then avoid criminal prosecution by claiming that they were "just doing their job." As the First Circuit stated in *Cintolo*, "[w]e refuse to chip some sort of special exception for lawyers into the brickwork of § 1503." 818 F.2d at 996. We respect the importance of allowing defense counsel to perform legitimate activities without hindrance and recognize the potential dangers that could arise if prosecutors were permitted to inquire into the motives of criminal defense attorneys ad hoc. This case, however, does not create that avenue of inquiry; our conclusion is limited to the specific facts of this case. Viewing the facts and inferences most favorably to the government, as we are required to do, there was ample basis for the jury to find that Cueto corruptly endeavored to obstruct the due administration of justice. The jury was justified in concluding that Cueto had the requisite knowledge of the FBI's investigation of Venezia, the grand jury's inquiry, and the district court's proceedings and then acted in a manner that had the natural and probable effect of interfering with the lawful function of those governmental entities and the due administration of justice. His role as a defense attorney did

---

11. Cueto also asserts an alternative argument that his attempts to persuade the local prosecutor to indict a state official for misconduct are protected by the First Amendment. Speech which is false and misleading is not protected by the First Amendment's right to freedom of speech. *Herbert v. Lando*, 441 U.S. 153, 171, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *United States v. Walton*, 36 F.3d 32, 35 (7th Cir.1994). Just as false statements are not immunized by the First Amendment, meritless litigation based on false

accusations and criminal intentions does not fall within the scope of protected speech and "is not immunized by the First Amendment right to petition." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). Cueto fails to show that his conduct is entitled to First Amendment protection; Cueto's conduct is not the kind of conduct with even a colorable claim to First Amendment protection and his argument must fail.

not insulate him from the criminal consequences of his corruptly-motivated actions. Accordingly, we affirm Cueto's convictions on Counts 2, 6, and 7.

## II. CONSPIRACY TO DEFRAUD THE UNITED STATES

Cueto next challenges his conviction on Count 1 for conspiring to defraud the United States in violation of 18 U.S.C. § 371, arguing that the statute is unconstitutionally vague as applied to the conduct charged in the indictment. He claims that the "conspiracy to defraud" clause is void for vagueness in the instant case because neither the statutory language, the legislative history, nor the case law interpreting § 371 provides adequate notice to a person of ordinary intelligence that conduct such as that charged in the instant indictment would violate the statute. Cueto also argues that his conviction should be reversed because it may rest on a legally or constitutionally invalid theory.

 Count 1 of the indictment charged Cueto with conspiracy to defraud the United States, in violation of § 371, which states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years or both.

18 U.S.C. § 371. We have recognized that the statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of the government; neither the conspiracy's goal nor the means used to achieve it need to be independently illegal. *United States v. Jackson,* 33 F.3d 866, 870 (7th Cir.1994). To sustain a conviction for conspiracy to defraud, the record must demonstrate: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) an intent to commit the substantive offense—in this case, the intent to obstruct justice.

*United States v. Cyprian,* 23 F.3d 1189, 1202 (7th Cir.1994). Intent, as well as the agreement, may be inferred from circumstantial evidence concerning the relationship of the parties, their overt acts, and the totality of their conduct. *United States v. Marren,* 890 F.2d 924, 933 (7th Cir.1989).

 The meaning of "conspiracy to defraud" is framed in general terms; it is impossible for Congress to anticipate, identify, and define each and every context in which an agreement to act would qualify as a conspiracy to defraud. As the Supreme Court recognized in *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), "general statements of the law are not inherently incapable of giving fair and clear warning, . . . even though 'the very action in question has [not] previously been held unlawful.'" 117 S.Ct. at 1227 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In *Hammerschmidt v. United States,* 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924), the Supreme Court clarified the meaning of conspiracy to defraud:

> To conspire to defraud the United States means . . . to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

265 U.S. at 188, 44 S.Ct. 511. The fact that § 371 has been applied to agreements not expressly anticipated by Congress nor specifically articulated in the statute does not demonstrate ambiguity nor does it create vagueness problems. "A statute can be unambiguous without addressing every interpretative theory offered by a party. It need only be 'plain to anyone reading the Act' that the statute encompasses the conduct at issue." *Salinas v. United States,* —— U.S. ——, ——, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997) (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 115

L.Ed.2d 410 (1991)). In fact, the Second Circuit has recognized that an indictment charging a conspiracy to defraud need only articulate with particularity "the essential nature of the alleged fraud." *United States v. Helmsley*, 941 F.2d 71, 90–91 (2d Cir. 1991).

Although § 371 does not specifically articulate that Cueto's various acts, which impaired the FBI's investigation, impeded the inquiries of the grand jury, and delayed and obstructed the proceedings in the district court, fall within its scope, the instant indictment alleges with particularity "the essential nature of the alleged fraud" and identifies Cueto's specific conduct which furthered the conspiracy. The allegations in the indictment specifically describe the conduct charged as part of the essential nature of the alleged fraud, which provides the basis of Cueto's conviction for conspiracy to defraud. As applied to the conduct charged in the instant indictment, the conspiracy to defraud clause of § 371 is not unconstitutionally vague, and the plain and ordinary meaning of "conspiracy to defraud" necessarily reaches Cueto's conduct.

▪▪▪ Cueto, however, argues that the specificity of the indictment is problematic and far-reaching because it includes noncriminal conduct, which may not properly be a valid basis for the criminal charges and, ultimately, his conviction on Count 1. Cueto contends that his conduct is lawful "lawyering conduct" and that he cannot be guilty of a conspiracy to commit acts which are not criminal. To the contrary, the record clearly demonstrates that his conduct, which necessarily includes his corrupt endeavors, was not typical conduct of a lawyer and that it certainly was not lawful lawyering conduct. Based on our earlier determinations that there was sufficient evidence at trial to convict Cueto on the obstruction of justice charges for his litigation-related conduct, we can similarly dispose of the present argument. Although his actions initially may have stemmed from routine, even vigorous, advocacy, at some point his conduct exceeded the scope of lawful lawyering conduct. " [A]cts which are themselves legal lose their legal character when they become constitu-

ent elements of an unlawful scheme.' " *United States v. Bucey*, 876 F.2d 1297, 1312 (7th Cir.1989) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). Indeed, it is evident that many of his actions were prohibited by the rules of professional responsibility and the canons of legal ethics. *See* Transcript, 22:1–114. Although those violations do not necessarily constitute criminal violations of the law, they are further evidence of an intent to participate in the conspiracy.

We recognize that Cueto may initially have been hired in his professional capacity to provide legal advice and representation, but it was equally reasonable for the jury to conclude from the evidence presented at trial that his representation also was undertaken for a criminal purpose in an attempt to protect the illegal gambling operation and to prevent government interference and that Cueto's role in the conspiracy was to use the power of his office as an attorney for the corrupt purpose of impairing, impeding, and obstructing the investigation, indictment, and prosecution of the illegal gambling and racketeering enterprise. Similarly, it was reasonable for the jury to conclude that Cueto agreed to participate in this scheme for his personal financial gain; the income generated by Venezia's illegal gambling operation was used to fund additional business ventures pursued in partnership with Cueto. Examining the evidence in the light most favorable to the government, we conclude that a rational jury could have found that the government proved the elements of § 371 beyond a reasonable doubt and that Cueto conspired with others and purposefully and knowingly participated in a corrupt scheme to defraud the United States. Accordingly, we find no error with Cueto's conviction on Count 1.

## III. EVIDENTIARY RULINGS OF THE DISTRICT COURT

▪▪▪ Cueto also claims that he is entitled to a new trial based on the district court's incorrect evidentiary rulings. He challenges three specific evidentiary rulings, in which the district court excluded the tran-

script of the state injunction hearing in *Venezia v. Robinson* and Robinson's testimony at the *Vogt* hearing and admitted redacted portions of certain documents. We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir.1997). The defendant has "a heavy burden in challenging a trial court's evidentiary rulings on appeal...." *United States v. Briscoe*, 896 F.2d 1476, 1489–90 (7th Cir.1990). The trial court's rulings are given special deference "because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *United States v. Torres*, 977 F.2d 321, 329 (7th Cir.1992). Under an abuse of discretion standard, reversal is warranted "only when the trial judge's 'decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision....'" *Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir.1992) (quoting *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563–564 (7th Cir.1984)).

■ Cueto first complains that the district court's decision to exclude the transcript of the injunction hearing prevented him from showing that he had a reasonable belief that Robinson was in fact a corrupt agent. The district court refused to admit the transcript of the hearing into evidence because, among other reasons, the hearing was conducted in violation of Robinson's rights as determined by this court in *Venezia v. Robinson*, 16 F.3d 209 (7th Cir.1994). Specifically, Robinson received notice of the injunction hearing through fraudulent pretenses created by Cueto, and the state court judge denied Robinson his right to counsel and conducted the hearing in violation of his right to due process of law. The district court recognized that Cueto should not be able to profit from his own wrongdoing and therefore excluded the transcript. We find no error with this determination.

■ Next, Cueto contends that the court erred by denying him the ability to present testimony to demonstrate his reasonable belief that Robinson perjured himself at the *Vogt* hearing. The record shows that the district court limited Cueto's testimony because he intended to attack Robinson's credibility and to discuss testimony Robinson had given in other court proceedings. The district court ruled that the proposed evidence was hearsay and excluded it. We agree with the district court's ruling that Cueto should not be permitted to discuss on the witness stand testimony Robinson had given in other court proceedings. FED.R.EVID. 801. The court also determined that because Robinson was never called as a witness his credibility could not be attacked. *See* Transcript, 26:120–121. We find no error in the court's decision to exclude this evidence.

■ Finally, Cueto argues that the redacted documents, admitted by the district court, provided an incomplete and inaccurate description of his purpose for publishing the *East Side Review* articles and his reasons for submitting various filings to the court. However, the record demonstrates that the district court redacted the various documents because in a pre-trial motion, the judge had determined that prosecutorial misconduct was not a viable defense and the documents in question included various allegations of prosecutorial misconduct and attacked the integrity of the prosecutors. The court refused to allow any discussion of or reference to allegations of governmental misconduct to be presented to the jury. Cueto disregards the record and does not address the specific grounds for the trial court's rulings on the exclusion of this evidence. We conclude that the court's decision to redact the documents was proper; admission of the documents in their entirety would have impermissibly placed allegations of prosecutorial conduct before the jury. *See United States v. Glover*, 101 F.3d 1183 (7th Cir.1996).

■ For the sake of argument, even if the district court's rulings were erroneous, reversal is not required so long as the errors were harmless, and "harmful error results only if the error has a substantial and injurious effect or influence on the jury's verdict." *United States v. Schoenborn*, 4 F.3d 1424, 1429 (7th Cir.1993). A defendant is entitled

to a new trial only if there is "a reasonable possibility" that the exclusion of the evidence had "a prejudicial effect upon the jury's verdict." *United States v. Berry,* 92 F.3d 597, 600 (7th Cir.1996). When viewed in the context of the entire trial and the totality of the evidence, the jury heard substantial evidence to support the government's theory of prosecution. The admission of the excluded evidence would not have produced a different result in this case; the jury possessed more than enough evidence to convict Cueto for conspiring to defraud the government and for obstructing the due administration of justice. Thus, even if the district court's evidentiary rulings were erroneous, the errors were harmless, and Cueto is not entitled to a new trial.

Cueto also argues that he is entitled to a new trial because the district court violated his Sixth Amendment right to confront witnesses by refusing to allow defense counsel to impeach Venezia with his grand jury testimony during cross-examination. Normally, we review a trial court's restriction on or limitation of cross-examination for an abuse of discretion. *United States v. Sasson,* 62 F.3d 874, 882 (7th Cir.1995). However, where the restriction impacts the defendant's Sixth Amendment right to confrontation, the review is *de novo. Id.* "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination. *Sasson,* 62 F.3d at 883.

On direct examination, Venezia admitted that he had perjured himself in his grand jury testimony to protect Cueto. *See* Transcript, 5:223–229. As such, the value of his grand jury testimony was limited. Nonetheless, Cueto contends that Venezia's grand jury testimony was crucial to impeach other aspects of his testimony at trial. Mere re-

strictions on the scope of cross-examination do not necessarily constitute a constitutional error in violation of the Confrontation Clause. *Delaware v. Van Arsdall,* 475 U.S. 673, 682, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). So long as defense counsel has sufficient opportunity to cross examine a witness, it is of peripheral concern to the Sixth Amendment how much opportunity counsel gets to "hammer [a] point home to the jury." *Sasson,* 62 F.3d at 882. Even though the district court excluded Venezia's grand jury testimony, Cueto had ample opportunity to demonstrate Venezia's lack of credibility during cross-examination. We therefore conclude that Cueto's Sixth Amendment right was not compromised.

## IV. SENTENCING ISSUES

Finally, Cueto contends that the district court erroneously calculated his sentence, arguing that the three counts of obstruction of justice should have been grouped pursuant to United States Sentencing Guideline § 3D1.2. We review the district court's factual determinations underlying the application of the Sentencing Guidelines for clear error. *United States v. Owolabi,* 69 F.3d 156, 162 (7th Cir.1995). A district court's decision between two permissible choices involves resolution of facts that requires the perspective and special competence of the trial judge, and courts of appeals give due deference to the trial judge's determinations, "for it embodies the traditional exercise of discretion by a sentencing court." *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

Section 3D1.2 requires that the sentencing judge group any count "involving the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2. This section contemplates a grouping decision based on a "single course of conduct with a single criminal objective" and does not authorize the grouping of offenses that do not represent essentially one composite harm. *Id.* at Ap-

plication Note 4.[12] A primary consideration in this section is whether the offenses involve different victims, and "victim" is defined as the person "who is directly and most seriously affected by the offense...." *Id.* at Application Note 2. For offenses in which there are no identifiable victims, the victim for purposes of this section is the societal interest that is harmed, and the grouping decision is based on "the nature of the interest invaded by each offense." *United States v. Bruder,* 945 F.2d 167, 170 (7th Cir.1991).

██ This case is a "victimless" crime, so the harm to societal interests must be considered. Cueto argues that his crimes harmed the same societal interests and fall within the scope of Sentencing Guideline § 3D1.2. Instead, the district court accepted the government's argument that different societal interests were harmed in each offense of conviction and consequently the judge considered each count separately for purposes of calculating of Cueto's sentence.[13]

The district court relied primarily on this court's decision in *United States* v. *Owolabi,* in which we affirmed a judge's decision not to group an immigration offense and a counterfeit securities offense. 69 F.3d at 167. Cueto attempts to distinguish *Owolabi* from the present case, arguing that his offenses involved convictions under the same statute, unlike the conduct charged in *Owolabi* which involved separate offenses of conviction. He argues that the conduct for which he was convicted ultimately shared a common goal with a singular purpose: to obstruct the investigation, indictment, and prosecution of the illegal gambling and racketeering case. In his reply brief, Cueto emphasizes that the government characterized his actions as "a unitary effort" to prevent the government from shutting down the gambling operation, and he contends that the government cannot abandon that theory of a unitary purpose to justify the imposition of a longer sentence based upon its argument that multiple socie-

tal interests were harmed. Appellant's Reply Brief at 30.

We do not dispute Cueto's argument that the government characterized Cueto's actions as a unitary effort with a common goal, and we certainly recognize that the instant case is distinguishable from *Owolabi* because Cueto's offenses of conviction involve violations of the same statute. Notwithstanding these arguments, Cueto's conduct invaded three distinct societal interests—the proper functioning of the FBI, the grand jury, and the district court—and each entity has a fundamentally separate and unique governmental function. Cueto's conduct disrupted and interfered with the lawful function of various governmental entities at different times throughout a period of approximately two or three years. His purpose may have involved only one criminal objective, but it certainly did not involve a single course of action. The district court's determination that the societal interests harmed were sufficiently distinct to preclude grouping was not clearly erroneous. Therefore, we conclude that district court judge properly applied Sentencing Guideline § 3D1.2 when he calculated Cueto's sentence.

### CONCLUSION

For the reasons discussed above, keeping in mind the limited scope of our holding, we AFFIRM the defendant's convictions and the sentence imposed by the district court.

---

12. For example, the same crime against the same victim on separate occasions would not be grouped because each separate crime, even though they may be identical, involves separate instances of risk of harm.

13. By not grouping the offenses of conviction together when calculating his sentence, the district court effectively increased Cueto's sentence.